1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PHONSAVANH PHONGMANIVAN,

                Petitioner,

    v.

RON HAYNES,

                Respondent.

Case No. 2:16-cv-00556-RAJ-MAT

REPORT AND RECOMMENDATION

14       Petitioner, a state prisoner who is currently confined at Stafford Creek Corrections Center

15 in Aberdeen, Washington, seeks relief under 28 U.S.C. § 2254 from a 2011 King County

16 Superior Court judgment and sentence. Dkts. 5, 39, Ex. 1. Respondent has filed an answer to

17 petitioner's habeas petition and submitted relevant portions of the state court record.[1] Dkts. 38,

18 39. Petitioner has not filed a response to respondent's answer.

19       Having considered the parties' submissions, the balance of the record, and the governing

20 law, the Court recommends that the federal habeas petition (Dkt. 5) be DENIED without an

21 evidentiary hearing. The Court also recommends that a certificate of appealability be DENIED.

22

23  [1] The Court notes that the record submitted in this case is very large and disorganized and may be missing some portions of some testimony. However, there is nothing to suggest that the missing components impact or affect the outcome of petitioner's claims. The Court notes that it would be helpful in the future if the Attorney General's Office could ensure that transcripts are submitted in chronological order.

1        I.    FACTUAL AND PROCEDURAL HISTORY

2        The Washington State Court of Appeals ("Court of Appeals"), on direct appeal,

3    summarized the facts relevant to petitioner's conviction as follows:

4        On October 31, 2008, Margilynn Umali and her boyfriend, Phonsavanh
      Phongmanivan, celebrated Halloween with several friends in the Belltown neighborhood
5    of Seattle. As they walked through Belltown, two men started flirting with Umali, and a
      fight broke out. Someone fired a gun, shooting Umali in the head. Phongmanivan and
6    another man carried Umali to the car and took her to the hospital. Umali survived the
      shooting, but a bullet remained lodged in her brain, causing her to suffer from severe
7    aphasia.[2] Another victim, Roger Wright, suffered gunshot wounds to his leg and buttocks.

        The State charged Phongmanivan with the shootings. As Umali recovered and
8    began to regain her ability to speak, the State decided to call her as a witness at trial.
      Phongmanivan questioned her ability to testify and submit to meaningful cross-
9    examination. The court held a competency hearing, at which Umali testified, using a
      combination of oral and written responses, drawings, and gestures to respond to questions.
10   When asked about what happened the night of the shooting, she drew a picture of
      Phongmanivan holding the gun. At the end of the hearing, the court remarked, "[C]ertainly
11   this is the most profoundly disabled adult I've ever seen on the stand where testimony is
      being offered from that witness," but he ultimately found Umali competent to testify.

12       Before trial, Phongmanivan renewed his objection to Umali's testimony and moved
      to compel a forensic psychological exam to determine her competency and if the memories
13   she professed were real or manufactured. Phongmanivan's expert questioned whether
      Umali understood the events surrounding the assault and the trial proceedings, but he
14   admitted that no available test could determine whether her memories were real or not. The
      court denied the motion, and the case proceeded to trial.

15       At trial, both victims, Umali and Wright, testified that Phongmanivan was the
      shooter. A third witness, who videotaped the entire scene, could not identify Phongmanivan
16   as the shooter but stated that one of the men who carried Umali to the car was the shooter.
      The defense stipulated that Phongmanivan and another person carried Umali to the car and
17   that the other person who carried her to the car was not a suspect. Several other witnesses
      testified that the shooter was an Asian male with short hair wearing a Seattle Seahawks
18   jersey. Phongmanivan indicated that Gabriel McBride fit that description.

        McBride and his girl friend, Janelle Dalit, were at the scene of the shooting and
19   were friends with Roger Wright. Although Detective Eugene Ramirez conducted a full
      interview with Dalit a few days after the shooting, he was unable to locate or speak with
20   McBride. By the time of trial, Detective Ramirez could no longer locate Dalit because she
      moved and changed phone numbers. Originally, the prosecutor did not expect to call Dalit
      and McBride as witnesses.

21       The day before trial, the prosecutor had contact with Dalit for the first time. She
      stated that she did not respond to the prosecution's repeated attempts to locate her because

22   ――――――――――――
      [2] [Footnote 1 by Court of Appeals] "Aphasia" is defined as " '[a]ny of a large group of speech disorders
      involving defect or loss of the power of expression by speech, writing or signs, or of comprehending
23   spoken or written language, due to injury or disease of the brain or to psychogenic causes.' " *Payne v.
      Astrue,* No. 4:11–CV–01113, 2012 WL 5389705, at *5 n. 16 (M.D.Pa. Nov. 2, 2012) (alteration in
      original) (quoting DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 114 (32d ed.2012)).

1

2

3

4

5

6

7

8

9

10

11

12

she did not want to be involved in the case. The prosecutor informed Dalit of the defense's planned case strategy to convince her and McBride to testify.

On December 7, 2010, Phongmanivan interviewed Dalit and learned that the prosecutor had met with Dalit and McBride and informed them that the defense intended to blame McBride for the crime. Phongmanivan moved to dismiss based on the prosecutor's violation of a witness exclusion order. Although the trial court found the prosecutor's conduct inappropriate, it denied the motion. Instead, the court allowed Phongmanivan to cross-examine Dalit and McBride on anything that the prosecutor told them.

Dalit testified that she was with McBride at the time of the shooting, but she could not identify the shooter. She also testified that nothing in her statement to Detective Ramirez a few days after the shooting was any different from her trial testimony or defense interview. On cross-examination, Dalit admitted that she only learned Phongmanivan identified McBride as the shooter when the prosecutor told her.

On December 8, 2010, the defense interviewed McBride. McBride reported that he first learned about the State's efforts to locate him when Dalit told him about testifying and discussed her memory of the events with him. Phongmanivan renewed his motion to dismiss under CrR 8.3(b) for governmental misconduct. The court denied the motion, finding insufficient evidence to support dismissal of the case for prosecutorial misconduct. The court noted that due to possible Fifth Amendment concerns, the prosecutor was entitled to, if not ethically required to, inform McBride of Phongmanivan's allegation that McBride was the perpetrator. The court also ruled that Phongmanivan had not shown any prejudice.

The jury convicted Phongmanivan of two counts of first degree assault with firearm enhancements. The court imposed a standard range sentence of 306 months in prison.

Dkt. 38, Ex. 5, at 1-5; *State v. Phongmanivan*, Court of Appeals Cause No. 6685-7-I, 175 Wash. App. 1028 (2013).

13

14

15

16

17

18

19

20

Petitioner, through appellate counsel, appealed his conviction to the Court of Appeals.[3] Dkt. 39, Exs. 2, 3, 4. On June 24, 2013, the Court of Appeals affirmed the conviction. Dkt. 39, Ex. 5. Petitioner moved for reconsideration and the motion was denied. Dkt. 39, Exs. 6, 7. Petitioner filed a petition for review through appellate counsel with the Washington Supreme Court ("Supreme Court"). Dkt. 39, Ex. 8. On December 11, 2013, the Supreme Court denied review without comment. Dkt. 39, Ex. 9. On February 7, 2014, the Court of Appeals issued its mandate.[4]

21

22

23

---

[3] The Court notes that petitioner raised different grounds in his direct appeal than those raised in his federal habeas petition.

[4] The Court notes that respondent failed to include a copy of the mandate in the state court record but takes judicial notice of the state court record in *State v. Phongmanivan*, No. 66858-7-I located at: https://dw.courts.wa.gov/index.cfm?fa=home.casesummary&crt_itl_nu=A01&casenumber=668587&searchtype=aName&token=500FF171F688D1CDD404D50DD9CFEBF7&dt=4916F8A11DB8E0C4142104

REPORT AND RECOMMENDATION - 3

On February 4, 2015, petitioner filed a pro se personal restraint petition (PRP) with the Court of Appeals. Dkt. 39, Ex. 10. On February 5, 2015, petitioner filed a "motion to file additional pages" where he included additions to the arguments he had already raised in his PRP. Dkt. 39, Ex. 11. On May 4, 2015, the Court of Appeals dismissed the PRP. Dkt. 39, Ex. 12. Petitioner sought discretionary review in the Supreme Court. Dkt. 39, Ex. 13. On December 3, 2015, the Commissioner of the Supreme Court denied review. Dkt. 39, Ex. 14. Petitioner filed a motion to modify the Commissioner's ruling. Dkt. 39, Ex. 15. On February 10, 2016, the Supreme Court denied the motion to modify without comment. Dkt. 39, Ex. 16. The Court of Appeals issued a certificate of finality on April 1, 2016. *See* Dkt. 33 (*citing Phongmanivan v. Haynes*, No. 96980-9, 2020 WL 946132, at *4 (Wash. Feb. 27, 2020)).

Petitioner signed this federal habeas petition on April 9, 2016. Dkts. 1, 4. On July 6, 2016, respondent filed an answer to the petition seeking dismissal of the petition as barred by the statute of limitations. Dkt. 10. On November 7, 2016, the district court dismissed the petition as time barred. Dkt. 17. Petitioner appealed the dismissal. Dkts. 23, 24. On April 9, 2020, the Ninth Circuit Court of Appeals determined that the district court had erred in dismissing the habeas petition as barred by the statute of limitations and reversed and remanded the matter back to the district court.[5] *See* Dkts. 33, 34. On remand, this Court set a new briefing schedule, directing petitioner to file a

---

A60CC2E0C2&courtClassCode=A&casekey=155068586&courtname=COA, Division I (last visited April 23, 2021). *See Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted) (judicial notice is appropriate for "undisputed matters of public record, including documents on file in federal or state courts."); *see also Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) (courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

[5] The Ninth Circuit determined that the limitations period was tolled when petitioner filed a personal restraint petition with the Washington Court of Appeals on February 4, 2015, and the tolling ended when the Washington Court of Appeals issued a certificate of finality on April 1, 2016, not, as the district court had previously found, on February 10, 2016, when the Washington Supreme Court denied a motion to modify an order of its Commissioner denying discretionary review. *See* Dkts. 30, 33. Thus, the Ninth Circuit determined petitioner had timely filed his habeas petition on April 9, 2016. *Id.*

REPORT AND RECOMMENDATION - 4

1    new answer to the petition. Dkt. 35. Respondent filed an answer arguing that the petition should

2    be dismissed because several of petitioner's habeas grounds were not properly exhausted and are

3    now procedurally barred, and that the remaining claims should be denied on the merits. Dkt. 38.

4    Petitioner did not file a response.

5    II.    GROUNDS FOR RELIEF

6    Petitioner identifies the following grounds for habeas relief:

7    COMPLETE BREAKDOWN ADVERSARY PROCESS WHEN ALLEGED AND PROVEN IS PRESUMED PREJUDICE

8        Under United States Supreme Court and Washington State decisional law
precedent, a defense attorney in a criminal case is presumed to have acted competently

9    when his representation is being challenged on appeal for collateral attack. When a criminal
defense attorney is shrouded with the strong presumption of competence, but fails to act as

10   any competent criminal defense attorney would act regarding representation in a criminal
matter, then the reason for said defense attorney to fail to act with requisite degree of

11   competence falls into three general categories, to wit: (1) The criminal defense attorney
lacks the requisite degree of competence; (2) The criminal defense attorney possessed the

12   requisite degree of legal competence but intentionally failed to exercise such requisite
degree of legal competence; and/or (3) The criminal defense attorney possessed the

13   requisite legal competence to intentionally fail to perform as defendant's advocate, in
concert with the other judicial participants, with purpose to facilitate a conviction.

         Petitioner Phongmanivan is claiming that trial Attorney Flennaugh's conduct fails

14   under general category (3) which inherently creates an actual conflict of interest resulting
from trial attorney misconduct and acting in concert with the prosecution to secure a

15   conviction.
         Petitioner Phongmanivan' s trial attorney's challenged conduct could not have

16   been lack of legal competence because he used a plethora of tactical and strategic action
and/or inaction that was overtly contrary to the best interest of his client, and in concert

17   with the other judicial participants, to obtain a conviction of Mr. Phongmanivan with
secondary purpose of fraudulently creating defense to claims of ineffective assistance of
counsel.

18       Petitioner Phongmanivan herein claims that appointed trial Attorney Flennaugh
performed to legitimate acts of advocacy, but instead, deliberately did not raise any of the

19   numerous legal and factual defenses that would have required the case against him to be
dismissed as matter of law.

20       Petitioner Phongmanivan claims that there is no valid tactical and/or strategic
reason for any of trial Attorney Flennaugh's challenged conduct, as matter of law, therefore

21   the complete breakdown of the adversary process extends in principle to direct appeal
counsel Wilk's failure to raise all potentially reversible issues on direct appeal, constituting

22   constructive denial of direct appeal rights proximately caused by appellate attorney
deliberate inaction, also resulting in constructive denial of appellate counsel and appellate
counsel actual conflict of interest.

23   1.  GROUND ONE: IN THIS CASE THERE WAS A COMPLETE BREAKDOWN OF
THE ADVERSARY PROCESS PROXIMATELY CAUSED BY TRIAL
ATTORNEY MISCONDUCT, TRIAL ATTORNEY ACTUAL CONFLICT OF

INTEREST, PROSECUTOR MISCONDUCT AND JUDICIAL MISCONDUCT, INTER ALIA:

(A) TRIAL ATTORNEYS FLENNAUGH AND TVEDT INTENTIONALLY DID NOT CHALLENGE THE LACK OF FINDING OF PROBABLE CAUSE UNDER CrR 2.2(a) "A WARRANT OF ARREST MAY NOT ISSUE UNLESS THE COURT DETERMINES THAT THERE IS PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANT COMMITTED THE OFFENSE CHARGES," BECAUSE SAID TRIAL ATTORNEYS KNEW THAT THE INFORMATION FILED ON 11/5/08 WAS AND IS JURISDICTIONALLY DEFECTIVE AND WOULD NOT HAVE WITHSTOOD SCRUTINY UNDER PROVISIONS OF PRELIMINARY HEARING OR A REQUEST FOR A BILL OF PARTICULARS. […]

(B) TRIAL ATTORNEYS FLENNAUGH AND TVEDT INTENTIONALLY AND WITH PURPOSE DID NOT CHALLENGE THE JURISDICTIONALLY DEFECTIVE AND CONSTITUTIONALLY FLAWED INFORMATION WITH PURPOSE TO FABRICATE REASONS TO DELAY TRIAL UNTIL MARGILYN TESTIFY TO HER LEARNED MEMORY AT TRIAL. […]

(C) DEFENSE ATTORNEYS FLENNAUGH AND TVEDT BOTH WORKED IN CONCERT WITH THE PROSECUTOR AND TRIAL JUDGE TO VIOLATE MR. PHONGMANIVAN AND THE PUBLIC STATUTORY AND CONSTITUTIONAL SPEEDY TRIAL RIGHTS, WITH PURPOSE TO ALLOW TIME FOR MARGILYN UMALI TO BECOME MEDICALLY ABLE ENOUGH TO TESTIFY AGAINST MR. PHONGMANIVAN WITH THE JUDICIAL PARTICIPANTS USING LEADING QUESTIONS AND MEMORY THAT WAS TAUGHT TO HER BY THE PROSECUTION AND HER CARE GIVERS. […]

(D) THE FOLLOWING SEQUENCE OF EXCERPTS FROM THE COURT RECORD AND TRANSCRIPTS PROVIDES INDISPUTABLE EVIDENCE THAT THE DEFENSE ATTORNEYS AND PROSECUTOR ACTED IN CONCERT WITH PURPOSE TO ALLOW ENOUGH TIME FOR THE PROSECUTION AND CARE GIVERS TO PLANT A FALSE MEMORY INTO THE MIND OF MARGILYN OF WHICH ULTIMATELY FAILED SO TO COMPENSATE THE DEFENSE ATTORNEYS DID NOT CALL AN EXPERT WITNESS TO TESTIFY AS TO THE RETROGRADE AMNESIA MEDICAL CONDITION OF MARGILYN. […]

(E) AS PART OF THE HEREIN CLAIMED COMPLETE BREAKDOWN OF THE ADVERSARY PROCESS, APPOINTED APPELLATE ATTORNEY SUSAN WILK INTENTIONALLY DID NOT RAISE ON DIRECT APPEAL A PLETHORA OF POTENTIALLY REVERSIBLE GROUNDS, CLAIMS AND ISSUES AND REFUSES TO IDENTIFY ANY APPEAL TACTIC OR STRATEGY THAT WOULD JUSTIFY ATTORNEY WILK FROM FAILING TO RAISE SAID ISSUES ON DIRECT APPEAL AS OF RIGHT. […]

(F) AS PART OF THE HEREIN CLAIMED COMPLETE BREAKDOWN OF THE ADVERSARY PROCESS, TRIAL ATTORNEYS ROBERT FLENNAUGH AND COLETTE TVEDT CREATED A PLETHORA OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND TRIAL COUNSEL MISCONDUCT GROUNDS, CLAIMS AND ISSUES AND REFUSE TO IDENTIFY ANY TRIAL TACTICS OR STRATEGY THAT WOULD JUSTIFY SAID DEFENSE ATTORNEYS" FAILURE TO PROTECT PETITIONER PHONGMANIVAN'S STATE AND FEDERAL LEGAL AND CONSTITUTIONAL RIGHTS.

[…]

(G) TRIAL ATTORNEYS FLENNAUGH AND TVEDT MADE AN UNLAWFUL AND UNCONSTITUTIONAL AGREEMENT WITH PROSECUTOR MILLER FOR THE DEFENSE CLAIM THEY WERE CALLING JOE RUTTER AS A WITNESS WITH PURPOSE TO ATTEMPT TO MITIGATE THE IMPROPRIETIES OF DEPRIVING PETITIONER PHONGMANIVAN OF HIS RIGHT TO CONFRONTATION AND OTHER RELATED DUE PROCESS RIGHTS.

[…]

(H) DEFENSE ATTORNEYS FLENNAUGH AND TVEDT MADE IMPROPER AGREEMENT WITH PROSECUTOR MILLER AND THE TRIAL JUDGE TO DEPRIVE PETITIONER PHONGMANIVAN OF HIS RIGHT TO BE PRESENT AND PARTICIPATE IN DISCUSSIONS CONCERNING THE 1/11/11 JUROR NOTE SIGNED BY JURY FOREMAN BARBARA GARRETT WHICH STATES "IS IT POSSIBLE FOR THE TRANSCRIPT OF RYAN TREES' TESTIMONY TO BE AVAILABLE FOR US TO EITHER LISTEN TO OR READ? WE SEEM TO BE AT AN IMPASSE. SUGGESTIONS?"

[…]

(I) DEFENSE ATTORNEYS DELIBERATELY FAILED TO CHALLENGE THE ADMISSIBILITY OR AUTHENTICITY OF THE TERRY JONES VIDEO BECAUSE THE PROSECUTION NEEDED THE VIDEO TO SUPPORT PROSECUTOR MILLER'S PROSECUTION THEORY THAT THE VIDEO DEPICTED TWO MEN CARRYING MARGILYN, ONE OF WHOM WAS THE SHOOTER, WITH DEFENSE ATTORNEY INVADING THE JURY PROVINCE BY STIPULATING THAT THE ONE OF THE TWO MEN WEARING A WHITE LONG SLEEVE SHIRT WAS NOT A SUSPECT, THEREBY CONTRADICTING RYAN TREES' TESTIMONY THAT THE ONE OF THE TWO MEN WEARING THE WHITE SHIRT WAS THE SHOOTER.

[…]

(J) DEFENSE ATTORNEYS FLENNAUGH AND TVEDT MADE AN UNCONSTITUTIONAL AGREEMENT WITH PROSECUTOR MILLER TO NOT OBJECT TO HER UNLAWFUL AND IMPROPER COAXING THE JURY INTO ASKING TO SEE THE TERRY JONES VIDEO AND THE JOE RUTTER 911 TAPE DURING JURY DELIBERATIONS.

[…]

(K) DEFENSE ATTORNEYS FLENNAUGH AND TVEDT ALONG WITH PROSECUTOR MILLER AND THE TRIAL JUDGE PARTICIPATED IN AN UNCONSTITUTIONAL SELECTION OF JURORS THAT WERE NOT

LAWFULLY AND RANDOMLY SELECTED FROM A FAIR CROSS SECTION OF THE COMMUNITY RESULTING IN THE JURY IN THIS CASE BEING COMPOSED OF PREVIOUSLY REJECTED JURORS.

[…]

(L) DEFENSE ATTORNEY FLENNAUGH AND TVEDT ACTED IN CONCERT WITH PROSECUTOR MILLER TO OBTAIN A DIFFERENT JUDGE JUST PRIOR TO TRIAL BECAUSE THEN JUDGE HAYDEN HAD ALREADY INFORMED SAID ATTORNEYS THAT THEY WOULD NOT BE ALLOWED TO CHALLENGE JURORS FOR CAUSE AT A BENCH CONFERENCE AND TO DEPRIVE PETITIONER PHONGMANIVAN OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS OF LAW BY AVOIDING SPECIFIC RULINGS WITH PURPOSE TO PREVENT PETITIONER PHONGMANIVAN FROM ADEQUATE BASIS FOR A MEANINGFUL APPEAL.

[…]

(M) DEFENSE ATTORNEYS FLENNAUGH AND TVEDT ACTED IN CONCERT WITH PROSECUTOR MILLER AND JUDGE ROGERS ON 1/7/11 IN VIOLATION OF BOTH CONSTITUTIONAL AND CRIMINAL LAW WHEN THEY PRETEND TO RECEIVE A VALID NOTE FROM A JUROR WHO WAS NOT THE JURY FOREMAN WHICH RESULTED IN THE UNLAWFUL AND UNCONSTITUTIONAL REMOVAL OF JUROR NUMBER 9.

[…]

2. GROUND TWO: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF CONFLICT INTEREST FREE TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

3. GROUND THREE: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

4. GROUND FOUR: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF A LAWFULLY AND RANDOMLY SELECTED TRIAL JUDGE WHO HAS COMPETENT JURISDICTION OVER THE CRIMINAL CASE IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

5. GROUND FIVE: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A NEUTRAL, DETACHED, UNBIASED AND CONFLICT INTEREST PHONGMANIVAN TRIAL JUDGE IN VIOLATION OF THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

6. GROUND SIX: PETITIONER WAS DEPRIVED OF HIS RIGHT TO A GOVERNMENTAL MISCONDUCT PHONGMANIVAN CRIMINAL PROCEEDINGS ON VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

7. GROUND SEVEN: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF BEING TRIED ON CRIMINAL CHARGES ONLY IN A COURT OF COMPETENT JURISDICTION IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

8. GROUND EIGHT: PETITIONER WAS DEPRIVED OF HIS RIGHT TO A JURY TRIAL WITH THE JURY LAWFULLY AND RANDOMLY SELECTED FROM A FAIR CROSS-SECTION OF THE COMMUNITY IN VIOLATION OF THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

9. GROUND NINE: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT OF A PUBLIC TRIAL AT ALL SO-CALLED CRITICAL STAGES OF THE STATE CRIMINAL PROSECUTION INCLUDING, BUT NOT LIMITED TO, EXCLUDING JURORS FOR HARDSHIP AND CAUSE.

10. GROUND TEN: PETITIONER WAS DEPRIVED OF CONSTITUTIONAL RIGHT TO BE TRIED ON CRIMINAL CHARGES ONLY AFTER A JUDICIAL FINDING OF PROBABLE CAUSE AS TO EACH CRIME CHARGED IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

11. GROUND ELEVEN: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY PROTECTED RIGHT OF HAVING THE CRIMINAL CHARGES AGAINST HIM DISMISSED WITH PREJUDICE BASED OF TRIAL COURTS LACK OF COMPETENT JURISDICTION TO PROCEED AFTER VIOLATION STATE STATUTORY SPEEDY TRIAL LAWS IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

12. GROUND TWELVE: PETITIONER WAS DEPRIVED OF HIS RIGHT TO PUT ON A COMPLETE DEFENSE, DEPRIVED OF RIGHT OF COMPULSORY PROCESS TO CALL AND QUESTION WITNESSES FOR HIS DEFENSE SUCH AS AN EXPERT WITNESS, AND DEPRIVED RIGHT OF CONFRONTATION IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

13. GROUND THIRTEEN: PETITIONER WAS DEPRIVED OF HIS RIGHT OF ACQUITTAL TO BE ENTERED ON APPEAL AS MATTER OF LAW BASED ON THE LEGAL FACTS THAT THERE WAS NO ADMISSIBLE EVIDENCE AS TO COUNT II AND INSUFFICIENT ADMISSIBLE EVIDENCE REGARDING COUNT I IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

14. GROUND FOURTEEN: THE UNDERLYING JUDGMENT AND CONVICTION IS NULL AND VOID BASED ON CONSTRUCTIVE AND/OR ACTUAL DENIAL OF TRIAL COUNSEL BY VEHICLE OF TRIAL COUNSEL INTENTIONAL

INEFFECTIVENESS, TRIAL ATTORNEY MISCONDUCT, AND ACTUAL CONFLICT OF INTEREST PROXIMATELY CAUSE BY UNLAWFUL AND UNCONSTITUTIONAL AGREEMENT WITH OTHER JUDICIAL PARTICIPANTS TO CONVICT PETITIONER PHONGMANIVAN BY MEANS OF UNLAWFUL AND UNCONSTITUTIONAL CONDUCT AS HEREIN DESCRIBED IN GROUND ONE.

15. GROUND FIFTEEN: THE UNDERLYING JUDGMENT AND SENTENCE IS NULL AND VOID BASED ON JUDICIAL, PROSECUTOR AND DEFENSE ATTORNEY UNLAWFUL AGREEMENT TO NOT HAVE A RANDOMLY SELECTED IMPARTIAL AND UNBIASED JUDGE TO PRESIDE OVER PETITIONER'S CRIMINAL PROCEEDINGS AND TRIAL IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

16. GROUND SIXTEEN: PETITIONER PHONGMANIVAN WAS CONSTRUCTIVELY DENIED STATE DIRECT APPEAL APPOINTED COUNSEL TO A DEGREE CONSTITUTION ACTUAL DENIAL OF COUNSEL ON STATE DIRECT APPEAL AS OF RIGHT, BASED ON APPOINTED APPELLATE COUNSEL'S FAILURE TO RAISE ON DIRECT APPEAL AS OF RIGHT, THE GROUNDS CLAIMS AND ISSUES ENCOMPASSED IN ABOVE GROUNDS ONE THROUGH FIFTEEN OF THE FUNCTIONALLY CONSTITUTES ABANDONMENT BY COUNSEL ON STATE DIRECT APPEAL AS OF RIGHT, CREATING A JURISDICTIONAL DEFECT IN THE CONSTITUTION OF STATE DIRECT APPEAL AS OF RIGHT CULMINATING IN THE TIME CONSTRAINTS OF 28 U.S.C. § 2244(d) NOT BEGINNING UNTIL PETITIONER PHONGMANIVAN HAS BEEN AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL TO RAISE ALL POTENTIALLY REVERSIBLE ISSUES ON STATE DIRECT APPEAL AS OF RIGHT, SUPPORTED BY FACTS HEREIN ENCOMPASSED IN GROUND ONE.

17. GROUND SEVENTEEN: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO BE PRESENT AND TO PARTICIPATE IN EXCESS OF THIRTY BENCH CONFERENCES THAT WERE NOT REPORTED AT WHICH THE JUDICIAL PARTICIPANTS MADE SECRET AGREEMENTS TO UNCONSTITUTIONALLY DEPRIVE PETITIONER PHONGMANIVAN OF HIS PROCEDURAL AND SUBSTANTIVE CONSTITUTIONAL RIGHTS, INCLUDING BUT NOT LIMITED TO, THE RIGHT TO A PUBLIC TRIAL, WHEREAT JURORS WERE DISMISSED FOR CAUSE WITHOUT CAUSE BEING ESTABLISHED, AND JURORS DISMISSED FOR HARDSHIP WITH NO RECORD BEING MADE OF ANY VALID FINDING OF HARDSHIP WITH NO RECORD BEING MADE OF ANY VALID FINDING OF HARDSHIP THEREBY DEPRIVING PETITIONER OF A RANDOMLY SELECTED JURY.

18. GROUND EIGHTEEN: PETITIONER HAS BEEN AND IS BEING DENIED HIS RIGHT TO HAVE ACCESS TO THE COMPLETE TRIAL COURT RECORD TO ENABLE HIM TO HAVE AN ADEQUATE AND MEANINGFUL OPPORTUNITY

TO PREPARE AND PRESENT ALL THE GROUNDS, CLAIMS AND ISSUES IN THIS INITIAL COLLATERAL ATTACK ON STATE COURT CONVICTION.

Dkt. 5, at 3-4, 6, 10, 20, 32, 47, 52, 54, 56, 58, 60, 61, 65-67.

### III.    DISCUSSION

Respondent argues that petitioner failed to properly exhaust Grounds 2-18 and all but one sub-claim raised in Ground 1(D) in the state courts and that those claims are now procedurally defaulted and cannot be presented in federal court. Dkt. 38, at 28-34. Respondent concedes that petitioner properly exhausted Grounds 1(A), (B), (C), (E), (F), (G), (H), (I), (J), (K), (L), (M) and the remaining sub-claim of Ground 1(D) but argues that those claims should be denied on the merits. *Id.* Petitioner did not file a response and, as such, did not respond to respondent's specific exhaustion arguments. Petitioner does argue in his petition that he has exhausted all of his claims. Dkt. 5, at 69.

As discussed below, the Court concludes petitioner failed to properly exhaust Grounds 2-18 and the following sub-claims raised in Ground 1(D): trial counsel purposefully caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees. These grounds are procedurally defaulted, petitioner fails to demonstrate cause and prejudice to overcome the procedural default, and they should be denied. The Court further concludes that petitioner properly exhausted Grounds 1(A), (B), (C), (E), (F), (G), (H), (I), (J), (K), (L), (M) and the remaining sub-claim of Ground 1(D): trial counsel was ineffective in failing to call an expert to explain Margilyn Umali's medical condition. However, the Court concludes that the properly exhausted claims should be denied on the merits. Likewise, the Court concludes an evidentiary hearing is not necessary.

REPORT AND RECOMMENDATION - 11

A.    Exhaustion

Before seeking federal habeas relief, a state prisoner must exhaust the remedies available in the state courts. The exhaustion requirement reflects a policy of federal-state comity, intended to afford the state courts "an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation and citation marks omitted).

There are two avenues by which a petitioner may satisfy the exhaustion requirement.  First, a petitioner may properly exhaust his state remedies by "fairly presenting" his claim in each appropriate state court, including the state supreme court with powers of discretionary review, thereby giving those courts the opportunity to act on his claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995).  "It has to be clear from the petition filed at each level in the state court system that the petitioner is claiming the violation of the federal constitution that the petitioner subsequently claims in the federal habeas petition." *Galvan v. Alaska Dep't of Corrections*, 397 F.3d 1198, 1204 (9th Cir. 2005).

Second, a petitioner may technically exhaust his state remedies by demonstrating that his "claims are now procedurally barred under [state] law." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 436, 351 (1989)); *see also Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007) (en banc). If the petitioner is procedurally barred from presenting his federal claims to the appropriate state court at the time of filing his federal habeas petition, the claims are deemed to be procedurally defaulted for purposes of federal habeas review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion because "there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (2007).  Federal habeas

review of procedurally defaulted claims is barred unless the petitioner can either demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 724.

1. *Proper Exhaustion*

    a.    *Grounds 2-18, and Ground 1(D) Sub-claims: trial counsel purposefully caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees.*

    Petitioner did not raise Grounds 2-18 on direct appeal or in his personal restraint petition (PRP) to the Court of Appeals. Dkt. 39, Exs. 2, 3, 4, 8, 10, 11. Petitioner attempted to raise these claims to the Supreme Court in his motion for discretionary review, alleging, incorrectly, that these claims were "before the Court of Appeals" in his PRP proceedings.[6] Dkt. 39, Ex. 13, at 415. In its ruling denying review the Supreme Court did not specifically address Grounds 2-18. *See* Dkt. 39, Ex. 14.

    A claim is not exhausted "where the claim has been presented for the first and only time in a procedural context in which the merits will not be considered." *Castille v. Peoples*, 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). Presentation of a claim to the Supreme Court for

---

[6] The Court notes that petitioner's petition and his motion for discretionary review include exhibits indicating that, after filing his PRP, petitioner filed a motion with the Court of Appeals requesting that the court compel appointed counsel on his direct appeal to provide him various discovery materials and portions of the record and that the Court stay the time limit for filing his PRP until 30 days after he receives the materials requested from appellate counsel. Dkt. 39, Ex. 13, at 449. Petitioner's exhibits to his motion for discretionary review also include what he indicates is a re-typed version of the Court of Appeals' notation ruling which: (1) directed appellate counsel to turn over their file to petitioner, and (2) denied his motion to stay stating that to the extent petitioner sought the opportunity to file a new PRP , such a petition would be time-barred, and to the extent he sought permission to supplement his timely filed PRP with evidence he hoped to obtain later, his request was premature. Dkt. 39, Ex. 13, at 449. There is no indication in the record that petitioner moved thereafter to amend his petition to include Grounds 2-18.

REPORT AND RECOMMENDATION - 13

the first time in a motion for discretionary review does not constitute fair presentation of the claim for exhaustion purposes. *Id.*, at 351 (rejecting the argument that "submission of a new claim to a State's highest court on discretionary review constitutes a fair presentation"); *see also Greer v. Stewart*, No. C07-464RSL, 2008 WL 743866, at *2 (W.D. Wash. Mar. 17, 2008). Because petitioner did not fairly present Grounds 2-18 to the state Supreme Court, they are not properly exhausted.

Petitioner also failed to present the following sub-claims contained in Ground 1(D) of his federal habeas petition to the state Supreme Court: trial counsel purposefully caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees. Although petitioner presented these sub-claims in his PRP to the Court of Appeals, he failed to raise them again in his motion for discretionary review to the state Supreme Court. *See* Dkt. 39, Exs. 10, 11, 13.

Proper exhaustion requires that a claim be presented at each level of review under the same legal theory and based on the same operative facts. Petitioner did not expressly do that here. He did, however, state in his motion for discretionary review that he "prays this Supreme Court will grant review of all grounds, claims and issues encompassed in underlying personal restraint petition[.]" Dkt. 39, Ex. 13, at 428. The question is whether this attempt at incorporation by reference satisfies the exhaustion requirement. In *Baldwin v. Reese*, 541 U.S. 27, 30-32 (2004) the Supreme Court observed that federal habeas corpus law does not require a state court judge to read through lower court opinions or briefing to discover the existence of a federal claim. "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a

1   petition or a brief (or a similar document) that does not alert it to the presence of a federal claim

2   in order to find material, such as a lower court opinion in the case, that does so." *Id.*

3         In some circumstances, incorporation by reference of a prior court document may satisfy

4   the exhaustion requirement. In *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005)

5   (internal citations omitted), the Ninth Circuit explained that fair and full presentation satisfying

6   exhaustion occurs with presentation of a federal constitutional claim "(1) to the proper forum, (2)

7   through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim[.]"

8   In *Insyxiengmay*, the petitioner presented to the state supreme court three federal constitutional

9   claims in an appendix consisting of a full copy of his personal restraint petition, and devoted the

10   body of his motion for discretionary review to the state appellate court's dismissal on the grounds

11   of timeliness. *Id.* Noting that the appendix contained the arguments as to the constitutional claims,

12   the court found clear presentation of those claims as federal issues to the state supreme court. The

13   court distinguished cases involving arguments relying on documents never presented to the higher

14   court. *Id.* at 668-69. *Insyxiengmay*, in the appendix filed in the state supreme court, "presented

15   extensive argument in support of all three claims as well as citations to the requisite authority and

16   to relevant parts of the record." *Id.* at 669.

17         This Court has found exhaustion where a petitioner's motion seeking discretionary review

18   identifies an issue for review and attaches briefs or other documents to the petition that contain the

19   arguments in support of the issue. *See, e.g., Silva v. Holbrook*, No. C16-0378, 2016 WL 8235139

20   at *6 (W.D. Wash. Nov. 2, 2016), *adopted*, 2017 WL 568822 (W.D. Wash. Feb. 13, 2017) (in

21   motion for discretionary review petitioner asserted entitlement to discharge based on "sixteen (16)

22   discrete issues raised in the operative pleadings herein[,]" and attached copies of his personal

23   restraint petition and supplemental petition); *Wiggin v. Miller-Stout*, No. C14-1474, 2015 WL

2137319 *7 (W.D. Wash. Mar. 20, 2015) ("[P]etitioner arguably put the Washington Supreme Court on notice of his claims by reasserting them in a summary fashion in his motion for discretionary review and by specifically incorporating into his motion all of the arguments contained in his personal restraint petition."), *adopted*, 2015 WL 2137439 (W.D. Wash. May 6, 2015); *see also Miller v. Quinn*, No. 07-35531, 2009 WL 117985 at *1 (9th Cir. Jan. 9, 2009) (finding exhaustion where petition identified a claim, but did not refer to federal constitutional issues, but relevant law addressing federal constitutional issues was discussed extensively in attachments to petition).

This case is distinguishable from *Insyxiengmay*, and the other cases cited herein, because it appears petitioner did not attach to his motion for discretionaryd review the documents referenced in his motion for discretionary review, i.e., his entire personal restraint petition, or the portions of the petition addressing the sub-claims in question.[7] *See*, Dkt. 39, Ex. 13. Accordingly, petitioner failed to properly exhaust the following Ground 1(D) sub-claims: trial counsel purposefully caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees.

    b.    *Ground 1(A), (B), (C), (E), (F), (G), (H), (I), (J), (K), (L), (M) and the remaining sub-claim of Ground 1(D):  trial counsel was ineffective in failing to call an expert to explain Margilyn Umali's medical condition*

Respondent concedes petitioner properly exhausted his remaining claims (Grounds 1(A), (B), (C), (E), (F), (G), (H), (I), (J), (K), (L), (M) and the remaining sub-claim of Ground 1(D), that trial counsel was ineffective in failing to call an expert to explain Margilyn Umali's medical

---

[7] The Court notes that only the first two pages of the personal restraint petition appear to be attached to the motion for discretionary review. *See* Dkt. 29, Ex. 13.

1    condition). Dkt. 38. These grounds were raised to the Court of Appeals in the initial PRP and

2    presented to the state Supreme Court in petitioner's motion for discretionary review. Dkt. 39, Exs.

3    10, 11, 13.

4          Accordingly, those claims will be addressed on the merits below.

5          2.    *Technical Exhaustion*

6          As discussed above, petitioner did not properly exhaust Grounds 2-18 and the following

7    sub-claims contained in Ground 1(D) of his federal habeas petition: trial counsel purposefully

8    caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali;

9    did not object to improper leading questions of Margilyn Umali; did not properly cross-examine

10   Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in

11   closing; and allowed the State to call Ryan Trees. As respondent maintains, these claims are

12   technically exhausted because if petitioner attempted to raise them in a second personal restraint

13   petition, the state courts would find them barred by Washington law. Under RCW 10.73.090(1), a

14   petition for collateral attack on a judgment and sentence in a criminal case must be filed within

15   one year after the judgment becomes final, subject to exceptions that do not apply here. *See* RCW

16   10.73.100. A judgment becomes final for purposes of state collateral review on the date that the

17   appellate court issues its mandate disposing of a timely direct appeal. RCW 10.73.090(3)(b).  Here,

18   the state court issued its mandate well over one year ago.[8] It therefore appears clear that petitioner

19

20   _____

21   [8] The Court of Appeals issued its mandate on February 7, 2014. *See State v. Phongmanivan*, No. 66858-7-
     I located at:
     https://dw.courts.wa.gov/index.cfm?fa=home.casesummary&crt_itl_nu=A01&casenumber=668587&sear
22   chtype=aName&token=500FF171F688D1CDD404D50DD9CFEBF7&dt=4916F8A11DB8E0C4142104
     A60CC2E0C2&courtClassCode=A&casekey=155068586&courtname=COA, Division I (last visited
23   April 23, 2021); *see Harris v. Cty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation
     omitted) (judicial notice is appropriate for "undisputed matters of public record, including documents on
     file in federal or state courts."); *see also Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002)

would now be time barred from returning to the state courts to present his unexhausted claims. *See* RCW 10.73.090. Moreover, because petitioner has previously presented a personal restraint petition to the state courts, the state courts are unlikely to entertain another such petition. *See* RCW 10.73.140 (successive petition bar).

Accordingly, the Court concludes that petitioner has technically exhausted, and procedurally defaulted, Grounds 2-18 and the following sub-claims contained in Ground 1(D) of his federal habeas petition: trial counsel purposefully caused a delay in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees.

### 3. *Cause and Prejudice*

Federal habeas review of petitioner's procedurally defaulted claims is barred unless he can demonstrate cause and prejudice, or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. To satisfy the "cause" prong of the cause and prejudice standard, petitioner must show that some objective factor external to the defense prevented him from complying with the state's procedural rule. *Id.* at 753; *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (a petitioner can demonstrate "cause" if he shows constitutionally ineffective assistance of counsel, the unavailability of a factual or legal basis for a claim, or some interference by officials). To show "prejudice," petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage,

---

(courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original). And only in a "truly extraordinary case," the Court may grant habeas relief without a showing of cause or prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 338 (1995).

In *Martinez v. Ryan,* 566 U.S. 1, 132 S.Ct. 1309 (2012), the Supreme Court established a limited exception to the general rule that a federal court cannot grant a habeas petition that has been procedurally defaulted in state court. *See Coleman*, 501 U.S. at 729–30. Specifically, in *Martinez*, the Supreme Court held that inadequate assistance of postconviction review counsel or lack of counsel "at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance *at trial*." *Martinez*, 132 at 1315 (emphasis added). To establish cause under *Martinez*, the petitioner must show that "(1) the underlying ineffective assistance of trial counsel claim is 'substantial'; (2) the petitioner was not represented or had ineffective counsel during the [post-conviction relief ('PCR') ] proceeding; (3) the state PCR proceeding was the initial review proceeding; and (4) state law required (or forced as a practical matter) the petitioner to bring the claim in the initial review collateral proceeding." *Dickens v. Ryan*, 740 F.3d 1302, 1319 (9th Cir. 2014) (en banc) (citing *Trevino v. Thaler*, 569 U.S. 413, 422, 133 S.Ct. 1911, 1918, 185 L.Ed.2d 1044 (2013)). To satisfy the first prong of *Martinez*, "a prisoner must ... demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S.Ct. at 1318. "An IAC claim has merit where (1) counsel's 'performance was unreasonable under prevailing professional standards,' and (2) 'there is a reasonable probability that but for counsel's unprofessional errors, the result would

1    have been different.'" *Cook v. Ryan*, 688 F.3d 598, 610 (9th Cir. 2012) (internal citation

2    omitted). "Substantiality" requires a petitioner to demonstrate that "reasonable jurists could

3    debate whether ... the petition should have been resolved in a different manner or that the issues

4    presented were adequate to deserve encouragement to proceed further." *Detrich v. Ryan*, 740

5    F.3d 1237, 1245 (9th Cir. 2013) (internal citation omitted). "[A] claim is 'insubstantial' if 'it

6    does not have any merit or ... is wholly without factual support.'" *Id.* (*quoting Martinez,* 132

7    S.Ct. at 1319).

8         *Martinez* also made clear that this exception applies only to the "initial-review" collateral

9    proceedings and does not apply to "attorney errors in other kinds of proceedings, including appeals

10   from initial-review collateral proceedings, second or successive collateral proceedings, and

11   petitions for discretionary review in a State's appellate courts." *Martinez*, 132 at 1320. Further,

12   *Martinez* only applies to claims alleging ineffective assistance of *trial* counsel. *Id.*, at 1315.

13        Petitioner's technically exhausted and procedurally defaulted Ground 1(D) sub-claims

14   argue that trial counsel: purposefully caused a delay in trial; informed the jury there were no

15   neurological tests done on Margilyn Umali; did not object to improper leading questions of

16   Margilyn Umali; did not properly cross-examine Margilyn Umali; caused a two-week Christmas

17   trial break; gave quotes of Margylin Umali in closing; and allowed the State to call Ryan Trees.

18   There is no dispute that petitioner raised these procedurally defaulted Ground 1(D) sub-claims to

19   the Court of Appeals in his initial PRP. However, after his PRP was dismissed initially by the

20   Court of Appeals, petitioner did not raise these specific sub-claims again in his motion for

21   discretionary review to the Supreme Court. Because the *Martinez* exception only applies to the

22   initial review collateral proceedings, it does not excuse petitioner's default in failing to raise these

23   ineffective assistance of counsel sub-claims in his motion for discretionary review to the Supreme

1  Court. *See Senior v. Glebe,* No. C15-952 JCC-BAT, 2016 WL 5107047, at *4 (W.D. Wash. July

2  22, 2016), *report and recommendation adopted sub nom. Senior v. Gilbert*, No. C15-0952-JCC-

3  BAT, 2016 WL 4992677 (W.D. Wash. Sept. 19, 2016), *aff'd*, 720 F. App'x 882 (9th Cir. 2018)

4  (finding *Martinez* did not apply to excuse petitioner's default where pro se petitioner raised

5  ineffective assistance claim in initial personal restraint petition but failed to raise it in his motion

6  for discretionary review to the Supreme Court).

7       With respect to Grounds 2-18, petitioner failed to properly include these claims in his initial

8  PRP to the Court of Appeals and then attempted to raise them for the first time in his motion for

9  discretionary review to the state Supreme Court. Of those grounds only Grounds 2, 3, 14 and 15,

10  appear to challenge the effectiveness or assistance of trial counsel and, therefore, might potentially

11  fall under the exception articulated in *Martinez*.[9] However, these claims consist solely of

12  generalized conclusory allegations and legal conclusions devoid of any factual support.

13  Specifically, those clams state:

14       GROUND TWO: PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONAL
        RIGHT OF CONFLICT INTEREST FREE TRIAL COUNSEL IN VIOLATION OF THE

15       SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES
        CONSTITUTION. […]

16       GROUND THREE: PETITIONER WAS DEPRIVED OF HIS
        CONSTITUTIONAL RIGHT OF EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN

17       VIOLATION OF THE FIRST, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS
        TO THE UNITED STATES CONSTITUTION. […]

18       GROUND FOURTEEN: THE UNDERLYING JUDGMENT AND
        CONVICTION IS NULL AND VOID BASED ON CONSTRUCTIVE AND/OR

19       ACTUAL DENIAL OF TRIAL COUNSEL BY VEHICLE OF TRIAL COUNSEL
        INTENTIONAL INEFFECTIVENESS, TRIAL ATTORNEY MISCONDUCT AND

20       ACTUAL CONFLICT OF INTEREST PROXIMATELY CAUSED BY UNLAWFUL
        AND UNCONSTITUTIONAL AGREEMENT WITH OTHER JUDICIAL

21       PARTICIPANTS TO CONVICT PETITIONER PHONGMANIVAN BY MEANS OF

22  [9] Likewise, the Supreme Court has declined to extend the *Martinez* exception to claims of ineffective
   assistance of appellate counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2067, 198 L. Ed. 2d 603 (2017)

23  (declining to expand the *Martinez* exception to the distinct context of ineffective assistance of appellate
   counsel). As such, the *Martinez* exception also does not apply to excuse petitioner's procedural default with
   respect to Ground 16 which raises a generalized claim of ineffective assistance of appellate counsel.

REPORT AND RECOMMENDATION - 21

UNLAWFUL AND UNCONSTITUTIONAL CONDUCT AS HEREIN DESCRIBED IN GROUND 1.

GROUND FIFTEEN: THE UNDERLYING JUDGMENT AND SENTENCE IS NULL AND VOID BASED ON JUDICIAL, PROSECUTOR AND DEFENSE ATTORNEY UNLAWFUL AGREEMENT TO NOT HAVE A RANDOMLY SELECTED IMPARTIAL AND UNBIASED JUDGE TO PRESIDE OVER PETITIONER'S CRIMINAL PROCEEDINGS AND TRIAL IN VIOLATION OF THE FOURTH, FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION. […]

Dkt. 5. As petitioner fails to articulate the factual basis for these conclusory claims, he fails to show these claims are substantial such that his default should be excused.[10] *See Martinez,* 132 S.Ct. at 1319.

Petitioner fails to demonstrate that any factor external to the defense prevented him from complying with the state's procedural rules and, thus, he has not demonstrated cause for his procedural default. As discussed above, the *Martinez* exception does not apply to excuse petitioner's procedural default with respect to the procedurally defaulted Ground 1(D) sub-claims or Grounds 2, 3, 14 or 15. Because petitioner has not met his burden of demonstrating cause for his procedural default, the Court need not determine whether there was any actual prejudice. *See Cavanaugh v. Kincheloe*, 877 F.2d 1443, 1448 (9th Cir. 1989) (citing *Smith v. Murray*, 477 U.S. 527, 533 (1986)).[11] In addition, petitioner makes no colorable showing of actual innocence. Petitioner thus fails to demonstrate that his procedurally defaulted claims are eligible for federal habeas review. Therefore, the Court should DENY Grounds 2-18[12] and the following sub-claims

---

[10] The Court notes that petitioner does raise claims regarding trial counsel's alleged intentional ineffectiveness in Ground 1 which are properly exhausted and which the Court addresses on the merits below.

[11] Even if petitioner could establish cause with respect to Grounds 2, 3, 14 and 15, he fails to show prejudice as he fails to articulate the factual basis for these claims and thus fails to show the generalized alleged errors "infected his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).

[12] Even if Grounds 2-18 were properly exhausted they would fail under a merits review as they consist entirely of conclusory allegations unsupported by any specific facts. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

1  contained in Ground 1(D) of his federal habeas petition: trial counsel purposefully caused a delay

2  in trial; informed the jury there were no neurological tests done on Margilyn Umali; did not object

3  to improper leading questions of Margilyn Umali; did not properly cross-examine Margilyn Umali;

4  caused a two-week Christmas trial break; gave quotes of Margylin Umali in closing; and allowed

5  the State to call Ryan Trees.

6  B.    Merits review

7         Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a habeas corpus

8  petition may be granted with respect to any claim adjudicated on the merits in state court only if

9  (1) the state court's decision was contrary to, or involved an unreasonable application of, clearly

10  established federal law, as determined by the Supreme Court, or (2) the decision was based on an

11  unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d).

12  In considering claims pursuant to § 2254(d), the Court is limited to the record before the state court

13  that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v.*

14  *Pinholster*, 563 U.S. 170, 181-82 (2011); *see also Gulbrandson v. Ryan*, 738 F.3d 976, 993 (9th

15  Cir. 2013). "When more than one state court has adjudicated a claim, [the Court analyzes] the last

16  reasoned decision." *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005) (citing *Ylst v.*

17  *Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

18         Under § 2254(d)(1)'s "contrary to" clause, a federal court may grant the habeas petition

19  only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a

20  question of law, or if the state court decides a case differently than the Supreme Court has on a set

21  of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under

22  the "unreasonable application" clause, a federal habeas court may grant the writ only if the state

23  court identifies the correct governing legal principle from the Supreme Court's decisions, but

1   unreasonably applies that principle to the facts of the prisoner's case. *See id*. at 407-09. The

2   Supreme Court has made clear that a state court's decision may be overturned only if the

3   application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). The

4   Supreme Court has further explained that "[a] state court's determination that a claim lacks merit

5   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

6   the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough*

7   *v. Alvarado*, 541 U.S. 652, 664 (2004)).

8        Clearly established federal law, for purposes of AEDPA, means "the governing legal

9   principle or principles set forth by the Supreme Court at the time the state court render[ed] its

10  decision." *Lockyer*, 538 U.S. at 71-72. This includes the Supreme Court's holdings, not its dicta.

11  *Id.* "If no Supreme Court precedent creates clearly established federal law relating to the legal

12  issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or

13  an unreasonable application of clearly established federal law." *Brewer v. Hall*, 378 F.3d 952, 955

14  (9th Cir. 2004) (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

15       With respect to § 2254(d)(2), a petitioner may only obtain relief by showing that the state

16  court's conclusion was based on "an unreasonable determination of the facts in light of the

17  evidence presented in the state court proceeding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)

18  (quoting 28 U.S.C. § 2254(d)(2)); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A]

19  decision adjudicated on the merits in a state court and based on a factual determination will not be

20  overturned on factual grounds unless objectively unreasonable in light of the evidence presented

21  in the state-court proceedings."). The Court presumes the state court's factual findings to be sound

22  unless the petitioner rebuts "the presumption of correctness by clear and convincing evidence."

23  *Miller-El*, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)).

1    With these standards in mind, the Court turns to petitioner's remaining claims.

2        1.    *Ineffective Assistance of Trial Counsel*

3    Ground 1(A), (B), (C), (F), (G), (H) (I), (J), (K), (L), (M), and the remainder of Ground

4    1(D) of the petition are based on the theory that petitioner's trial attorneys intentionally provided

5    ineffective assistance by conspiring with the prosecutor and the trial judge in order to deprive him

6    of his right to a fair trial in various ways. Dkt. 5.

7        The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

8    counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance

9    claim is that counsel's unprofessional errors so upset the adversarial balance between defense and

10    prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v.*

11    *Morrison*, 477 U.S. 365, 374 (1986). Claims of ineffective assistance of counsel are evaluated

12    under the two-prong test set forth in *Strickland*. Under *Strickland*, a defendant must prove (1) that

13    counsel's performance was deficient and, (2) that the deficient performance prejudiced the

14    defense. *Strickland*, 466 U.S. at 687.

15        With respect to the first prong of the *Strickland* test, a petitioner must show that counsel's

16    performance fell below an objective standard of reasonableness. *Id*. at 688. Judicial scrutiny of

17    counsel's performance must be highly deferential. *Id*. at 689. "A fair assessment of attorney

18    performance requires that every effort be made to eliminate the distorting effects of hindsight, to

19    reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from

20    counsel's perspective at the time." *Id*.

21        The second prong of the *Strickland* test requires a showing of actual prejudice related to

22    counsel's performance. In order to establish prejudice, a petitioner "must show that there is a

23    reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

1   would have been different. A reasonable probability is a probability sufficient to undermine

2   confidence in the outcome." *Id*. at 694. The reviewing court need not address both components of

3   the inquiry if an insufficient showing is made on one component. *Id*. at 697.

4        While the Supreme Court established in *Strickland* the legal principles that govern claims

5   of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether

6   defense counsel's performance fell below the *Strickland* standard. *Harrington v. Richter*, 562 U.S.

7   86, 101 (2011). Rather, when considering an ineffective assistance of counsel claim on federal

8   habeas review, "[t]he pivotal question is whether the state court's application of the *Strickland*

9   standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court

10  must be granted a deference and latitude that are not in operation when the case involves review

11  under the *Strickland* standard itself." *Id*.

12       The state appellate courts rejected petitioner's ineffective assistance of trial counsel claims.

13  The Court of Appeals stated as follows:

> Phongmanivan claims he was denied effective representation at trial by his team of retained counsel and that appellate counsel was ineffective for failing to raise this issue. Specifically, Phongmanivan argues that his trial counsel (1) failed to challenge the probable cause supporting Phongmanivan's arrest, the adequacy of the information, the impartiality of the jury pool, the admissibility of the evidence, and the jury instructions; (2) colluded with the prosecutor to take a lengthy break in the trial over the Christmas holiday and to deny Phongmanivan the opportunity to request a transcript of voir dire; (3) failed to adequately cross-examine the victim and object to the State's closing argument (4) failed to obtain an expert regarding the victim's medical condition; and (5) denied Phongmanivan the right to be present when the jury listened to a recorded 911 call and the parties discussed a jury question.
>     To be entitled to relief in a personal restraint petition, a petitioner must present competent, admissible evidence showing that his factual assertions are based on more than speculation, conjecture, or inadmissible hearsay. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 828 P.2d 1086 (1992). Phongmanivan fails to meet this burden. Phongmanivan admits that he does not possess much of the evidence he believes will support his claims. But Phonmanivan's unsubstantiated allegations are insufficient to warrant relief in a personal restraint petition.
>     Furthermore, to establish ineffective assistance, Phongmanivan must show that counsel's performance was deficient and that prejudice resulted from the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 50 L. Ed. 2d 674 (1984). There is a strong presumption that counsel rendered effective assistance and made all

significant tactical decisions in the exercise of reasonable professional judgment. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Phongmanivan fails to meet this burden. For example, Phongmanivan fails to offer any relevant authority as to why his arrest was unlawful, the information was defective or the jury instructions were erroneous. Neither does Phongmanivan articulate how he was prejudiced by the prosecutor's characterization of witness testimony in closing argument or by the State calling a defense witness to testify. Moreover, many of Phongmanivan's claims are not supported by the record. For example, trial counsel vigorously challenged the victim's competency to testify and objected to the holiday break. In any event, all of these issues involve strategy, and counsel's decisions regarding matters of trial strategy or tactics do not constitute ineffective assistance of counsel. *State v. Argo*, 81 Wn. App. 552, 576, 915 P.2d 1103 (1996).

Dkt. 39, Ex. 12.

The state Supreme Court found, in relevant part, that:

As to the substance of Mr. Phongmanivan's claims, the acting judge correctly noted that Mr. Phongmanivan failed to support his claims with competent, admissible evidence. […]
As to ineffective assistance of counsel, Mr. Phongmanivan alleges that his trial attorneys participated in a conspiracy with the prosecutor and the trial judge to deprive him of his right to a fair trial in various ways, including in jury selection and in delaying the trial to allow a state witness to recuperate. […] [These claims] "lack evidentiary support" […] [as petitioner] provides no evidence of such a conspiracy, and none is evident from the record.

Dkt. 39, Ex. 14.

Petitioner fails to demonstrate the state appellate court's rejection of his ineffective assistance of trial counsel claims was contrary to or an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented. As the state appellate courts found, petitioner provides no factual support or evidence, beyond his own speculation, to support his generalized allegations of conspiracy or intentional misconduct by his attorneys, the judge or prosecutor. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." (internal citation omitted)). As such, petitioner fails to demonstrate trial counsel's performance was deficient or that he was prejudiced by counsel's alleged deficient performance.

Further, as discussed below, even to the extent some of petitioner's claims could be construed as alleging general ineffectiveness by trial counsel, separate from the intentional

REPORT AND RECOMMENDATION - 27

ineffectiveness and global conspiracy allegations and the theory underlying these claims, petitioner

fails to demonstrate that the state appellate courts erred or that he is entitled to habeas relief.

### a.   Grounds 1(A) and 1(B)

In Grounds 1(A) and 1(B) petitioner alleges:

> TRIAL ATTORNEYS FLENNAUGH AND TVEDT INTENTIONALLY DID NOT CHALLENGE THE LACK OF FINDING OF PROBABLE CAUSE UNDER CrR 2.2(a) "A WARRANT OF ARREST MAY NOT ISSUE UNLESS THE COURT DETERMINES THAT THERE IS PROBABLE CAUSE TO BELIEVE THAT THE DEFENDANT COMMITTED THE OFFENSE CHARGES," BECAUSE SAID TRIAL ATTORNEYS KNEW THAT THE INFORMATION FILED ON 11/5/08 WAS AND IS JURISDICTIONALLY DEFECTIVE AND WOULD NOT HAVE WITHSTOOD SCRUTINY UNDER PROVISIONS OF PRELIMINARY HEARING OR A REQUEST FOR A BILL OF PARTICULARS.
> […]
> TRIAL ATTORNEYS FLENNAUGH AND TVEDT INTENTIONALLY AND WITH PURPOSE DID NOT CHALLENGE THE JURISDICTIONALLY DEFECTIVE AND CONSTITUTIONALLY FLAWED INFORMATION WITH PURPOSE TO FABRICATE REASONS TO DELAY TRIAL UNTIL MARGILYN TESTIFY TO HER LEARNED MEMORY AT TRIAL.

Dkt. 5, at 4-9.

Petitioner alludes to a lack of probable cause for his arrest warrant. *Id.* However, petitioner

fails to adequately identify or explain exactly how petitioner believes the probable cause

determination was deficient. *Id.*; *see James v. Borg*, 24 F.3d at 26 ("Conclusory allegations which

are not supported by a statement of specific facts do not warrant habeas relief." (internal citation

omitted)). Furthermore, even if petitioner had adequately identified some defect in the probable

cause determination, petitioner fails to explain how he was actually prejudiced by trial counsel's

failure to object. Petitioner's constitutional right to a probable cause determination stems from the

Fourth Amendment, which "requires a timely judicial determination of probable cause as a

prerequisite to detention." *Gerstein v. Pugh*, 420 U.S. 103, 126, 95 S.Ct. 854, 43 L.Ed.2d 54

(1975). A state must provide "a fair and reliable determination of probable cause as a condition

for any significant pretrial restraint of liberty, and this determination must be made by a judicial

officer either before or promptly after arrest." *Id.* at 125 (footnote omitted). Nevertheless, "illegal arrest or detention does not void a subsequent conviction," and "although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause." *Id.* at 119; *see also United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) ("An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction."). Furthermore, "Washington law is in harmony with the federal cases regarding the effect of illegal arrest." *City of Pasco v. Titus*, 26 Wash. App. 412, 416, 613 P.2d 181, 183 (1980); *State v. Kennedy*, 8 Wash.App. 633, 636, 508 P.2d 1386, 1388 (1973) (neither an invalid entry nor an unlawful arrest would invalidate the defendant's conviction. It is the admission of evidence obtained incident to or as a result of illegal activity which can upset the conviction.). Here, petitioner makes no argument and points to no facts indicating that the allegedly defective probable cause determination undermined his subsequent conviction.

Thus, construing petitioner's claim to argue that trial counsel was ineffective in failing to challenge the probable cause determination, he fails to demonstrate a viable basis for counsel to object to the probable cause determination, that counsel was deficient for failing to make an objection, or that if an objection had been made there is a reasonable probability the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687.

Petitioner also alludes to the absence of language in the information regarding the theory of transferred intent with respect to the first-degree assault charged in Count II (relating to the victim Ms. Umali). Dkt. 5, at 4-9.

1    A defendant has a constitutional right under both the federal and Washington state

2    constitutions to be informed of the "nature and cause" of the charges against him. U.S. CONST.

3    amend. VI; WASH. CONST. art I, § 22 (amend. 10); *State v. McCarty*, 140 Wn.2d 420, 424–25,

4    998 P.2d 296 (2000). The Sixth Amendment guarantees criminal defendants the right to be

5    informed of the nature of the charges against them so as to permit adequate preparation of a

6    defense. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the

7    right ... to be informed of the nature and cause of the accusation...."). A charging document satisfies

8    these constitutional requirements "if it states all the essential elements of the crime charged[.]"

9    *McCarty*, 140 Wn.2d at 425; *State v. Kjorsvik*, 117 Wn.2d 93, 101–02, 812 P.2d 86 (1991); *Gautt*

10    *v. Lewis*, 489 F.3d 993, 1003–04 (9th Cir. 2007) ("to satisfy the Sixth Amendment, 'an information

11    [must] state the elements of an offense charged with sufficient clarity to apprise a defendant of

12    what he must be prepared to defend against.'" (*quoting Givens v. Housewright,* 786 F.2d 1378,

13    1380 (9th Cir.1986) (internal citations omitted)).

14    "An essential element is one whose specification is necessary to establish the very illegality

15    of the behavior charged." *State v. Goss*, 186 Wn.2d 372, 378 (2018) (internal citation and quotation

16    marks omitted). Washington state courts have affirmatively determined that "[t]he theory of […]

17    transferred intent is not [an] essential element[ ] of the crime of assault in the first degree" and, as

18    such, failure to include the theory in the charging document does not violate the constitutional

19    right to notice. *State v. Ibrahim*, 200 Wash. App. 1025 (2017); *see* RCW 9A.36.011(1)(a); *State v.*

20    *Elmi*, 166 Wn.2d 209, 214–15, 207 P.3d 439 (2009) ("RCW 9A.36.011(1)(a) [provides]: A person

21    is guilty of assault in the first degree if he or she, with *intent to inflict* great bodily harm: ...

22    [a]ssaults *another* with a firearm ...." (emphasis added). In so reasoning, we hold […] that once

23    the intent to inflict great bodily harm is established, usually by proving that the defendant intended

to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim. […] RCW 9A.36.011 encompasses transferred intent").

Petitioner fails to demonstrate the charging document violated his Constitutional right to notice under either federal or state law. Thus, to the extent petitioner can be construed to argue that trial counsel was ineffective in failing to challenge the sufficiency of the charging document because the information failed to include language regarding the theory of transferred intent, he fails to demonstrate there was a viable basis for counsel to object, that counsel was deficient for failing to make an objection, or that if an objection had been made there is a reasonable probability the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687.

Petitioner also alludes to trial counsel's failure to object to the sufficiency of the charging document on Double Jeopardy grounds, noting that he was charged with first-degree assault in addition to a firearm enhancement. Dkt. 5, at 4-9.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This principle applies to state criminal prosecutions through the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794-96 (1969). The guarantee against double jeopardy includes three distinct constitutional protections: "[It] protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (*quoting Brown v. Ohio*, 432 U.S. 161, 165 (1977)).

In *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), "the Supreme Court made clear that the protection against multiple punishments for the same offense did not necessarily preclude cumulative punishments in a single prosecution." *Plascencia v.*

1    *Alameida*, 467 F.3d 1190, 1204 (9th Cir. 2006). Rather, the Court determined that "[t]he key to

2    determining whether multiple charges and punishments violate double jeopardy is legislative

3    intent." *Id.* (*citing Hunter*, 459 U.S. at 368–69). Thus, "[w]hen the legislature intends to impose

4    multiple punishments, double jeopardy is not invoked. *Id.* (*citing Hunter*, 459 U.S. at 368–69

5    (where "a legislature specifically authorizes cumulative punishment under two statutes […] a

6    court's task of statutory construction is at an end and the prosecutor may seek and the trial court

7    or jury may impose cumulative punishment under such statutes in a single trial.")).

8        Here, Washington law is clear in providing for additional punishment if it is established

9    that the defendant was armed with a firearm at the time of his offense. RCW 9.94A.533(3).

10   Furthermore, "Washington courts have repeatedly held that the Washington Legislature

11   specifically intended that use of a firearm be separately punished, even when use of a firearm is

12   an element of the underlying crime." *Wright v. Gilbert*, No. C16-5097 RBL-KLS, 2016 WL

13   3662065, at *10 (W.D. Wash. May 26, 2016), *report and recommendation adopted*, No. C16-5097

14   RBL-KLS, 2016 WL 3570788 (W.D. Wash. July 1, 2016) (*citing State v. Aguirre*, 168 Wn.2d 350,

15   229 P.3d 669 (2010) ("adding a deadly weapon enhancement to [defendant's] sentence for second

16   degree assault, an element of which is being armed with a deadly weapon, did not offend double

17   jeopardy"); *State v. Kelley*, 168 Wn.2d 72, 226 P.3d 773 (2010) ("imposition of a firearm

18   enhancement does not violate double jeopardy when an element of the underlying offense is use

19   of a firearm."); s*ee Plascencia*, 467 F. 3d at 1204 (imposition of 25-year to life imprisonment

20   sentence for first-degree murder in addition to 25-year to life sentencing enhancement for using a

21   firearm to commit the murder did not violate the double jeopardy clause where California

22   legislature intended to provide additional sentencing increase when a firearm is used to commit

23   murder).

1    Accordingly, construing petitioner's claim to argue that trial counsel was ineffective in

2    failing to challenge the charging document on Double Jeopardy grounds, he fails to demonstrate a

3    viable basis for counsel to object on that ground, that counsel was deficient for failing to make an

4    objection, or that if an objection had been made there is a reasonable probability the result of the

5    proceeding would have been different. *Strickland*, 466 U.S. at 687.

6    Accordingly, Grounds 1(A) and 1(B) should be DENIED.

7    *b. Ground 1(C)*

8    In Ground 1(C) petitioner alleges:

9    DEFENSE ATTORNEYS FLENNAUGH AND TVEDT BOTH WORKED IN
     CONCERT WITH THE PROSECUTOR AND TRIAL JUDGE TO VIOLATE MR.
10   PHONGMANIVAN AND THE PUBLIC STATUTORY AND CONSTITUTIONAL
     SPEEDY TRIAL RIGHTS, WITH PURPOSE TO ALLOW TIME FOR MARGILYN
11   UMALI TO BECOME MEDICALLY ABLE ENOUGH TO TESTIFY AGAINST
     MR. PHONGMANIVAN WITH THE JUDICIAL PARTICIPANTS USING
12   LEADING QUESTIONS AND MEMORY THAT WAS TAUGHT TO HER BY THE
     PROSECUTION AND HER CARE GIVERS.

13   Dkt. 5, at 10-19. Petitioner alludes to a self-created list of various dates accompanied by what he

14   purports to be the reasons for adjournments on those dates. *Id.*, at 10-19. Although it is somewhat

15   unclear, petitioner appears to take issue with the basis for some of the adjournments (although he

16   fails to clearly identify which adjournments) and appears to take issue with trial counsel's failure

17   to move to dismiss on speedy trial grounds. *Id.*

18   In considering petitioner's claim, the Court is limited to the record before the state court

19   that adjudicated the claim on the merits, and the petitioner carries the burden of proof. *Cullen v.*

20   *Pinholster*, 563 U.S. 170, 181-82 (2011); 42 U.S.C. § 2254(d); *see also Gulbrandson v. Ryan*, 738

21   F.3d 976, 993 (9th Cir. 2013). Here, petitioner fails to point to any evidence in the record before

22   the state courts demonstrating there was a viable basis for counsel to object on speedy trial grounds,

23   that counsel was deficient for failing to make an objection, or that if an objection had been made

it would have affected the outcome of the trial. Petitioner's unsupported self-created list of adjournments, in isolation, is insufficient to show trial counsel was deficient and petitioner points to nothing in the record before the state court that would illuminate this list in any respect.

Accordingly, Ground 1(C) should be DENIED.

    *c. Ground 1(D)*

In Ground 1(D) petitioner alleges:

THE FOLLOWING SEQUENCE OF EXCERPTS FROM THE COURT RECORD AND TRANSCRIPTS PROVIDES INDISPUTABLE EVIDENCE THAT THE DEFENSE ATTORNEYS AND PROSECUTOR ACTED IN CONCERT WITH PURPOSE TO ALLOW ENOUGH TIME FOR THE PROSECUTION AND CARE GIVERS TO PLANT A FALSE MEMORY INTO THE MIND OF MARGILYN OF WHICH ULTIMATELY FAILED SO TO COMPENSATE THE DEFENSE ATTORNEYS DID NOT CALL AN EXPERT WITNESS TO TESTIFY AS TO THE RETROGRADE AMNESIA MEDICAL CONDITION OF MARGILYN.

Dkt. 5, at 20. The state appellate courts rejected petitioner's claim that trial counsel was ineffective in failing to call an expert witness to testify regarding Ms. Umali's medical condition. Specifically, the state Supreme Court held:

    Mr. Phongmanivan also contends that counsel failed to obtain an expert witness to explain the victim's medical condition. Whether the victim was competent was a major issue at trial and discussed extensively on direct appeal. Margilyn Umali survived the shooting with significant permanent injuries, including mixed aphasia, a disorder that affects a person's ability to understand, speak, read, and write, but does not affect memory. For several months Ms. Umali was in the hospital, unable to speak and undergoing inpatient speech, physical, and occupational therapy. When she was released from the hospital she continued therapy. She progressed from responding to questions using only a physical "thumbs up"/"thumbs down," to using words and writing simple phrases. The defense objected to Ms. Umali testifying on competency grounds. The trial court conducted a competency hearing, and Ms. Umali correctly stated her name, her daughter's name, and that Mr. Phongmanivan was her boyfriend in 2008 and her daughter's father. She responded to simple, leading questions, primarily answering "yes" or "no" or in short phrases, supplementing her verbal answers with written answers and drawings. In that way she testified that on Halloween in 2008 she was with her boyfriend Mr. Phongmanivan and a Mr. Noy and Mr. Siphandone, to whom she also referred to as her "boyfriend." Asked to draw what she remembered, she drew a picture of Mr. Phongmanivan (who she called by his nickname, "Sam"), herself, and a figure she termed "a guy" standing by some cars. She independently offered that it was "Belltown" and that she told Mr. Phongmanivan not to fight. Asked what "Sam" had in his hand, she replied "[a] gun." On cross-examination Ms. Umali repeated that she was in Belltown with Sam and Mr. Siphandone. When defense counsel referred to deputy prosecutor Jennifer Write as Ms. Umali's "friend Jen," Ms.

Umali responded that the prosecutor was "the lawyer." Ms. Umali stated that telling the truth was good and right and that a lie was bad.

The defense suggested that Ms. Umali's family had implanted her memories. But the trial court found that while Ms. Umali was a profoundly disabled adult, her verbal and written testimony and drawings demonstrated that she was relying on her own memory, that she recalled some events, and that she understood the difference between right and wrong. The court stated that on the basis of its observations it did not believe Ms. Umali was being deceptive. And it stated that the defense could use Ms. Umali's medical records, which the court had ordered to be produced in discovery, to cross-examine Ms. Umali, test the reliability of her statements, and impeach her. The Court ultimately ruled that Ms. Umali was competent. As the Court of Appeals noted on direct appeal, the defense was provided with more than 10 volumes of medical records, and counsel conducted a thorough cross-examination that demonstrated to the jury that Ms. Umali had difficulty processing information. Defense counsel also extensively cross-examined Ms. Umali's doctors and rehabilitation specialists. Based on this record, Mr. Phongmanivan's claim that counsel was ineffective for not calling an expert to explain Ms. Umali's condition lacks merit. Counsel's strenuous efforts and cross-examination were more than sufficient to reasonably place Ms. Umali's condition before the jury. *See Harrington v. Richter*, 562 U.S. 86, 111, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.").

Dkt. 39, Ex. 14, at 4-5.

The record supports the state Supreme Court's description of the facts as well as the finding that trial counsel thoroughly and effectively cross-examined both Ms. Umali and her doctors and rehabilitation specialists regarding her condition and her difficulty processing information. *See* Dkt. 39, Ex. 17, at 227-264 (competency hearing). The record shows that, at trial, Ms. Umali experienced difficulties with oral communication and sometimes resorted to writing her answers. However, Ms. Umali testified that on Halloween night of 2008, she went out with petitioner ("Sam") and several other individuals and that petitioner was driving. Dkt. 39, Ex. 18, at 264-69. Due to her difficulties verbalizing her answers, the record reflects she drew a picture indicating that on Halloween night she and petitioner went out and that she, petitioner, a "guy" and a "girl" named Anitsa went downtown. Dkt. 39, Ex. 19, at 79-81. She drew a picture of petitioner and a gun and indicated petitioner had a gun, that she had seen the gun before, that petitioner had had it earlier in the day, and that it was in his pocket when they were at the downtown parking lot. *Id.*, at

83-84, 88-90. She testified that she was sure petitioner had shot her in the face and had had the gun. *Id.*, at 92-93. She drew a picture of where she, petitioner and two other individuals were at the time of the shooting and indicated petitioner got into a fight with a "guy" and she told him not to fight. *Id.*, at 84, 88. In court, Ms. Umali identified petitioner as the one who shot her. *Id.*, at 96-97.

During cross-examination, trial counsel made significant efforts to impeach Ms. Umali, eliciting that she did not remember asking others what had happened to her, that she did not remember a lot of things, and that the police had told her "what happened."[13] *Id.*, at 116-29, 131.

The record shows trial counsel also thoroughly and effectively cross-examined Ms. Umali's family, her medical providers and her rehabilitation specialists to demonstrate the severity and extent of Ms. Umali's medical condition and to call into question whether her memories may have been planted by others. For instance, during cross-examination of Ms. Umali's father, trial counsel elicited that Ms. Umali had trouble finding words, had aphasia, and had had to relearn a lot after her injury. Dkt. 39, Ex. 20, at 82-84. Counsel further elicited that when Ms. Umali came out of the hospital, she had asked her family what happened to her. *Id.*, at 87, 97.

The record shows that during cross-examination of Ms. Umali's speech pathologist, Courtney DeRuiter, trial counsel elicited that during tests sometimes Ms. Umali could not match the word with the correct object, that during some testing she could only correctly match family members with the displayed pictures one third of the time, and that she had wanted the speech pathologist to tell her what had happened to her. Dkt. 39, Ex. 21, at 79-84, 95-96, 103. During cross-examination of Dawn M. Ehde, a neuropsychologist who worked with Ms. Umali when she was an inpatient, trial counsel elicited that Ms. Umali had such severe aphasia that it was

---

[13] The record shows Ms. Umali also volunteered during cross-examination that petitioner "did it." *Id.*, at 119.

determined it would not be appropriate to give her a language or memory test while Ms. Umali was hospitalized; that as far as she knew Ms. Umali had never been given neuro psychological tests; and that Ms. Umali had repeatedly asked what had happened to her. Dkt. 39, Ex. 22, at 78, 80-82.

The record shows that during cross-examination of Johanne Lewin, a Harborview nurse practitioner who treated Ms. Umali as an inpatient, trial counsel elicited that Ms. Umali was unable to fully express her complaints; was diagnosed with mixed aphasia (difficulty expressing and understanding language) and dysphasia ( difficulty comprehending, moving her muscles to pronounce words, and swallowing); was able to identify some objects but not others; that while she improved to speaking short sentences after discharge she still relied on her family to express concerns; and in April 2010, she still had expressive aphasia and some dysphasia and difficulty expressing and understanding language. Dkt. 39, Ex. 23, 60-65, 69. Trial counsel also elicited the extent of Ms. Umali's injury during cross-examination of her treating physician Paul Lim including that the bullet had entered Ms. Umali's jaw and traveled to her brain. Dkt. 39, Ex. 24, at 171. During cross-examination of Ms. Umali's physical therapist, Kristin Kaupang, trial counsel elicited that when Ms. Umali tried to express in pictures where she went over the weekend her therapist was only able to understand her through cueing and gesturing. *Id.*, at 185.

The record shows that during cross-examination of Ms. Umali's physical medicine and rehabilitation specialist, Jennifer Zumsteg, trial counsel elicited that Ms. Umali had difficulty with abstract questions, had a difficult time recalling information during tests, and that her CT scan showed bullet fragments were lodged in her brain. Dkt. 39, Ex. 25, 24-25, 29, 30-31. And, during cross-examination of Ms. Umali's speech pathologist, Shannon McKeever, trial counsel elicited that during therapy Ms. Umali's family would sit with her at the table and Ms. Umali's brother

1    would occasionally give suggestions to her about what to draw in response, would clarify points

2    or would add information to what Ms. Umali told Ms. McKeever. *Id.*, at 72-73.

3        In sum, the record shows trial counsel thoroughly cross-examined and effectively elicited

4    information from Ms. Umali, her family members, and her medical providers, which demonstrated

5    the severity and extent of Ms. Umali's injuries and resulting impairment of her memory and ability

6    to comprehend and communicate, and placed in issue whether Ms. Umali's memories of the

7    shooting were her own or were potentially planted by her family members. The record supports

8    the state Supreme Court's conclusion that trial counsel conducted a thorough cross-examination

9    of Ms. Umali's doctors and rehabilitations specialists that demonstrated to the jury that Ms. Umali

10   had difficulty processing information.

11       The Court notes that petitioner appears to argue that trial counsel should have called a

12   medical expert, Dr. Muscatel, to testify at trial, but makes no argument and points to no facts to

13   indicate rwhat specifically Dr. Muscatel, or any other expert, would have said regarding Ms.

14   Umali's medical condition to support his defense, or that there was a reasonable probability that,

15   but for trial counsel's failure to call an expert, the result of the proceeding would have been

16   different. Dkt. 5, at 20-31. Thus, petitioner fails to demonstrate that trial counsel performed

17   deficiently when they did not present expert testimony regarding Ms. Umali's medical condition,

18   or that petitioner was prejudiced as a result. *See Strickland*, 466 U.S. at 689, 694; *Grisby v.*

19   *Blodgett,* 130 F.3d 365, 373 (9th Cir. 1997) (Upholding denial of ineffective assistance of counsel

20   habeas claim on the grounds that "speculation about what an expert could have said is not enough

21   to establish prejudice."); *Glasscock v. Taylor*, 740 F. App'x 566, 567 (9th Cir. 2018) ("state court

22   reasonably concluded trial counsel permissibly elected not to call a medical expert to rebut the

23   state's evidence that the victim had injuries consistent with sexual abuse […] [petitioner] has not

shown how such testimony would have supported the defense or offered alternative explanations for the victim's injuries."); *see Gallegos v. Ryan*, 820 F.3d 1013, 1035 (9th Cir. 2016) (sustaining the state court's determination that trial counsel was not ineffective where the petitioner did not adduce any expert testimony in state post-conviction proceedings to undermine the state's medical expert); *Schaefer v. Tilton*, No. CV 05-6669RSWL(JTL), 2008 WL 5233279, at *13 (C.D. Cal. Dec. 11, 2008).

Petitioner cites to no Supreme Court precedent, nor is the Court aware of any, holding that trial counsel was ineffective for failing to present a defense expert under circumstances similar to those in this case. Petitioner fails to show the state court's denial of this claim was contrary to, or an unreasonable application of, clearly established federal law as set forth by the United States Supreme Court or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1). Accordingly, the remainder of Claim 1(D) should be DENIED.

> ### d.  *Ground 1(F)*

In Ground 1(F), petitioner argues:

> AS PART OF THE HEREIN CLAIMED COMPLETE BREAKDOWN OF THE ADVERSARY PROCESS, TRIAL ATTORNEYS ROBERT FLENNAUGH AND COLETTE TVEDT CREATED A PLETHORA OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AND TRIAL COUNSEL MISCONDUCT GROUNDS, CLAIMS AND ISSUES AND REFUSE TO IDENTIFY ANY TRIAL TACTICS OR STRATEGY THAT WOULD JUSTIFY SAID DEFENSE ATTORNEYS" FAILURE TO PROTECT PETITIONER PHONGMANIVAN'S STATE AND FEDERAL LEGAL AND CONSTITUTIONAL RIGHTS.
>
> Trial Attorneys Flennaugh has refused to provide Petitioner Phongmanivan a response to Petitioner Phongmanivan's "FIRST REQUEST TO IDENTIFY TRIAL STRATEGY OR TACTIC REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS," which is set forth in substantial part below[.]

Dkt. 5, at 47. Petitioner then proceeds to include a copy or recitation of a letter he purportedly sent to one of his trial attorneys in which he requests that he explain his trial tactic or strategy in failing to raise various objections or take certain actions. *Id.*, at 47-51.

1      To the extent petitioner argues that trial counsel failed to respond, or to adequately respond,

2   to letters he sent to him after his conviction, he fails to identify a viable ineffective assistance of

3   trial counsel claim in that he does not address issues that arose at trial or directly challenge the

4   underlying judgment. Accordingly, petitioner fails to establish he is entitled to habeas relief on

5   this basis and Ground 1(F) should be DENIED.

6          *e.  Ground 1(G)*

7      In Ground 1(G) petitioner argues:

8   TRIAL ATTORNEYS FLENNAUGH AND TVEDT MADE AN UNLAWFUL AND
    UNCONSTITUTIONAL AGREEMENT WITH PROSECUTOR MILLER FOR THE
9   DEFENSE CLAIM THEY WERE CALLING JOE RUTTER AS A WITNESS WITH
    PURPOSE TO ATTEMPT TO MITIGATE THE IMPROPRIETIES OF DEPRIVING
10  PETITIONER PHONGMANIVAN OF HIS RIGHT TO CONFRONTATION AND
    OTHER RELATED DUE PROCESS RIGHTS.
11          Joe Rutter was a crucial State's witness because he contradicted the testimony of
    Ryan Trees, who was called by the State early in the trial, but was not on the defense
12  witness list, so there can be no legitimate reason for the defense attorneys to claim they
    were going to call Joe Rutter as a witness, except to assist the State in unconstitutionally
13  introducing the 911 tape of Joe Rutter without calling Joe Rutter as a witness[.]

14  Dkt. 5, at 52. Petitioner proceeds to provide his own description, or what he purports to be

    a transcription, of what was said on the 911 call in his petition. *Id.*, at 53.

15     The Sixth Amendment's Confrontation Clause confers upon the accused, "[i]n all criminal

16  prosecutions, ... the right ... to be confronted with the witnesses against him." U.S. Const. Amend.

17  VI. In *Crawford v. Washington*, the Supreme Court held the Confrontation Clause prohibits the

18  "admission of testimonial statements of a witness who did not appear at trial unless he was

19  unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford*,

20  541 U.S. 36, 54-55 (2004). Only testimonial statements cause the declarant to be a "witness" within

21  the meaning of the Confrontation Clause. *See id.* at 51. "It is the testimonial character of the

22  statement that separates it from other hearsay that, while subject to traditional limitations upon

23  hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813,

821 (2006). While the Court in *Crawford* declined to provide a comprehensive definition of "testimonial," the Court stated "[v]arious formulations of [the] core class of 'testimonial' statements:

> ex parte in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id*. at 51–52 (internal quotation marks, ellipsis, and citations omitted).

In *Crawford*, the Court held that the defendant's right of confrontation was violated because the trial court admitted evidence regarding his wife's statements in response to police interrogation, and she did not testify at trial. *Crawford*, 541 U.S. 36, 40–42, 65–69. The Court found the statements to be testimonial, because she made them "while in police custody, herself a potential suspect in the case." *Id*. at 65–69.  In several opinions since *Crawford*, the Supreme Court has further clarified, to some extent, what constitutes a "testimonial" statement for purposes of the Confrontation Clause. *See, e.g., Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006); *Michigan v. Bryant*, 562 U.S. 344, 361, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011); *Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 2181 (2015). In these opinions, the Supreme Court has focused on the "primary purpose" of the questions and responses in order to determine whether a particular statement is testimonial or nontestimonial. In *Davis*, the Court held that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

1

2    *Davis*, 547 U.S. at 822.

3         In *Clark*, the Court summarized the focus of the inquiry as follows: "In the end, the question

4    is whether, in light of all the circumstances viewed objectively, the 'primary purpose' of the

5    conversation was to 'creat[e] an out of court substitute for trial testimony.'" *Clark*, 576 U.S. 237,

6    245, 135 S.Ct. 2173, 2181 (2015). Thus, where the objective circumstances indicate that the

7    primary purpose of questioning is not investigative or intended to obtain evidence for use at trial,

8    the Supreme Court has found the responsive statements to be nontestimonial. *See, e.g., Clark*, 576

9    U.S. 237 (holding child's statements to teachers about abuse by defendant nontestimonial because

10   primary purpose of conversation was to "identify [ ] and end[ ] the threat" of violence during "an

11   ongoing emergency"); *Bryant*, 562 U.S. at 361 (holding that dying victim's identification of

12   defendant in response to officer's question of who had shot victim was nontestimonial; primary

13   purpose of question was to enable police to meet ongoing emergency of locating armed assailant,

14   not to obtain evidence for trial; "the prospect of fabrication in statements given for the primary

15   purpose of resolving [an] emergency is presumably significantly diminished"); *Davis*, 547 U.S. at

16   822 (holding statements made during a 911 call nontestimonial because the "circumstances

17   objectively indicat[e] that the primary purpose of the interrogation [was] to enable police

18   assistance to meet an ongoing emergency.").

19         In contrast, statements made to the police during an interview at a witness's home about a

20   domestic violence incident were found to be testimonial where there was no ongoing emergency,

21   and the "primary purpose of the interrogation [was] to establish or prove past events potentially

22   relevant to later criminal prosecution." *Davis*, 547 U.S. at 829–30; *see also United States v. Brooks*,

23   772 F.3d 1161, 1169–70 (9th Cir. 2014) (responses to a U.S. Postal Inspector's questions were

REPORT AND RECOMMENDATION - 42

1    testimonial because "a reasonable person would have understood the primary purpose to be

2    investigative").

3        While the Supreme Court has declined to categorically find statements made to someone

4    other than law enforcement personnel nontestimonial, it has stated that "[s]tatements made to

5    someone who is not principally charged with uncovering and prosecuting criminal behavior are

6    significantly less likely to be testimonial than statements given to law enforcement officers." *See*

7    *Clark*, 576 U.S. at 249.

8        Here, petitioner fails to show trial counsel provided ineffective assistance in placing Joe

9    Rutter on the defense witness list to "assist the State in unconstitutionally introducing the 911 tape

10   of Joe Rutter without calling [him] as a witness." Dkt. 5, at 52. As discussed above, petitioner

11   presents no facts to support his claim that trial counsel engaged in a conspiracy with the prosecutor

12   to intentionally violate petitioner's rights or deprive him of a fair trial. Furthermore, to the extent

13   petitioner's claim can be construed to argue that trial counsel was generally ineffective in failing

14   to adequately challenge the introduction of the 911 tape on Confrontation Clause grounds, such a

15   claim fails. Petitioner makes no argument as to why he believes that playing the Joe Rutter 911

16   tape for the jury violated his right to Confrontation, apart from asserting that Mr. Rutter did not

17   appear and testify. Petitioner has not identified where in the state court record the court may find

18   details regarding the specific statements made during the 911 call, but he does provide his own

19   description, or what he purports to be a transcription of, what was said on that call in his petition.

20   Dkt. 5, at 53. Specifically, petitioner provides the following purported transcription of the 911 call:

21           911 OPERATOR: Okay. Did you see who fired the shot?
             JOE RUTTER: Yeah, I did see.
22           911 OPERATOR: What did he look like.
             JOE RUTTER: I just saw a Seahawk uniform.
23           911 OPERATOR: Okay. Which way did he – is he on foot or is he in a car?
             JOE RUTTER: He was in the alley by the hot dog stand.
             911 OPERATOR: Where's the guy shot? Is he by the hot dog stand?

REPORT AND RECOMMENDATION - 43

JOE RUTTER: Yeah.
MEDIC DISPATCH: Is the person that shot him gone, yes or no?
JOE RUTTER: I don't see the person that shot him at all.
911 OPERATOR: And where is the – you say you have no idea where the guy is who had the gun?
JOE RUTTER: No, I don't.
911 OPERATOR: Did you witness the shooting?
JOE RUTTER: I just saw a gunshot and a Seahawk jersey.
911 OPERATOR: Was the guy white? Black? Indian? What?
JOE RUTTER: You know I don't see – I didn't see. He was kind of like a mixed.
911 OPERATOR: Did the Seahawks jersey have a number on it?
JOE RUTTER: No.
911 OPERATOR: Okay. What color – did he have pants or shorts? What else did he have on?
JOE RUTTER: I just saw the upper half. He was behind cars in the parking lot next to the hot dog stand.
911 OPERATOR: Okay. So when you last saw him he was going in what direction?
JOE RUTTER: He went back behind the alleyway there.
911 OPERATOR: Back behind the alley. Which direction is that? Which alley? To the east or the west?
JOE RUTTER: Behind First, in between First and Second.
911 OPERATOR: Okay.

Dkt. 5, at 53. Furthermore, there is evidence in the record that Mr. Rutter placed the 911 call just a few minutes after the shooting. Dkt. 39, Ex. 24, at 37-39, 52, 64.

Even accepting petitioner's version of what was said during the 911 call, he fails to demonstrate there was a viable basis for trial counsel to object on Confrontation Clause grounds. Petitioner's own account or transcription of the 911 call recording at issue tends to indicate that the call was made by Mr. Rutter under circumstances objectively indicating that the primary purpose of the questioning by the 911 operator and medic dispatch was to enable police assistance to meet an ongoing emergency. Specifically, petitioner's description of the 911 call tends to indicate the primary purpose of the questions were to enable police to locate the person who had been shot and locate and identifying the shooter who may still have been armed and potentially dangerous. *See, e.g., Nava v. Baughman*, 2017 WL 1927873, at *3 (C.D. Cal. May 9, 2017) (no Confrontation Clause violation in admitting petitioner's mother's 911 call because statements "were made in response to the 911 operator's questions and involved an ongoing, potentially

1 | dangerous situation."); *Rabb v. Sherman*, 646 F. App'x 564, 564–65 (9th Cir. 2016) (The state

2 | appellate court reasonably determined statements made by the victims to police just fifteen minutes

3 | after the carjacking, while some perpetrators were still potentially armed and fleeing in a stolen

4 | car, were directed to an ongoing emergency, not to a future prosecution, and thus they were non-

5 | testimonial.); *Gann v. Beard*, No. CV 12-1418 JAH (BLM), 2014 WL 12839184, at *11 (S.D. Cal.

6 | July 17, 2014), *report and recommendation adopted as modified sub nom. Gann v. Diaz*, No.

7 | 12CV1418-JAH (BLM), 2018 WL 4385371 (S.D. Cal. Sept. 14, 2018), *aff'd*, 802 F. App'x 283

8 | (9th Cir. 2020) ("[A] 911 call made during the course of an emergency situation is ordinarily made

9 | for the primary testimonial purpose of alerting the police about the situation and to provide

10 | information germane to dealing with the emergency. [..] [S]tatements to 911 operator were not

11 | testimonial […] [t]he dispatcher was primarily concerned with what was happening at the moment,

12 | in order to obtain information that would assist responding officers in rendering aid to the victims

13 | and finding the escaping perpetrator – not to secure a conviction in a court trial]") .

14 |     Here, petitioner makes no specific arguments regarding how the statements made during

15 | the 911 call in question implicated the Confrontation Clause. In sum, petitioner fails to

16 | demonstrate there was a viable basis for a Confrontation Clause objection, fails to show trial

17 | counsel was deficient in failing to object on that basis, or that if an objection had been made

18 | there is a reasonable probability the result of the proceeding would have been different. *See*

19 | *Strickland*, 466 U.S. at 687.

20 |     Accordingly, Ground 1(G) should be DENIED.

21 |       *f.   Ground 1(H)*

22 | In Ground 1(H) petitioner argues,

23 |     DEFENSE ATTORNEYS FLENNAUGH AND TVEDT MADE IMPROPER AGREEMENT WITH PROSECUTOR MILLER AND THE TRIAL JUDGE TO DEPRIVE PETITIONER PHONGMANIVAN OF HIS RIGHT TO BE PRESENT AND

REPORT AND RECOMMENDATION - 45

PARTICIPATE IN DISCUSSIONS CONCERNING THE 1/11/11 JUROR NOTE SIGNED BY JURY FOREMAN BARBARA GARRETT WHICH STATES "IS IT POSSIBLE FOR THE TRANSCRIPT OF RYAN TREES' TESTIMONY TO BE AVAILABLE FOR US TO EITHER LISTEN TO OR READ? WE SEEM TO BE AT AN IMPASSE. SUGGESTIONS?"

Petitioner Phongmanivan has not been provided the portion of the transcripts, if there is one, where the judicial participants discussed whether or not to allow the jury to revisit Ryan Trees' testimony in attempt to overcome the impasse they were experiencing.

This is extremely important because it implicates public trial rights, right to be present, due process rights both on trial level and right to a adequate record to be afforded a meaningful appeal, and whether or not the jury was questioned as to whether or not they knew Ryan Trees during jury voir dire, copies of which have not yet been provided to Petitioner[.]

Although Ground 1(H) appears to be framed as a challenge to the alleged conspiratorial actions, or intentional ineffectiveness of petitioner's trial attorneys, the state Supreme Court also separately addressed and rejected the argument that petitioner's constitutional right to be present was violated because he was not personally present for discussions concerning the juror note. Specifically, the state Supreme Court stated:

Mr. Phongmanivan argues that he was denied his right to be present for discussions concerning a jury question during deliberations. The jury, he alleges, had asked whether it could review the transcript of a witness's testimony. The federal and state constitutions afford a criminal defendant the right to be present at all critical stages of trial. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116 (1998). More specifically, a defendant has a right to be present at any stage that is critical to the outcome of the proceeding if his presence would contribute to the fairness of the procedure. *State v. Love*, 183 Wn2d 598, 608, 354 P.3d 841 (2015). Generally, in-chambers conferences between the court and counsel on legal matters are not critical stages except when the issues raised involve disputed facts. *Lord*, 123 Wn.2d at 306; *State v. Stacy*, 181 Wn. App. 553, 575-76, 326 P.3d 136, *review denied*, 181 Wn.2d 1008 (2014). Here, the jury's question did not raise a disputed issue of fact, and thus Mr. Phongmanivan's constitutional rights were not implicated if the in-chambers discussion took place outside of his presence.

"[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see Illinois v. Allen*, 397 U.S. 337, 338 (1970). The right to be present is largely derived from the Confrontation Clause of the Sixth Amendment, the primary interest secured being the defendant's right to confront and cross-examine the State's witnesses and evidence. *Allen*, 397 U.S. 337. The right is also protected by the Due Process Clause

REPORT AND RECOMMENDATION - 46

1   in situations where the defendant is not actually confronting the State's witnesses or evidence.

2   *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam). However, "the presence of a

3   defendant is a condition of due process to the extent that a fair and just hearing would be thwarted

4   by his absence, and to that extent only." *Gagnon*, 470 U.S. at 526 (quoting *Snyder v.*

5   *Massachusetts*, 291 U.S. 97, 105-06, 108 (1934)). "By the [Supreme] Court's limitation of this

6   right to "critical stages of the trial," clearly, a criminal defendant does not have a fundamental right

7   to be present at *all* stages of the trial." *La Crosse v. Kernan*, 244 F.3d 702, 707–08 (9th Cir. 2001).

8          For example, a defendant need not be present during all communications between a judge

9   and a juror. *See Gagnon*, 470 U.S. at 526 (holding that a defendant's absence during an *in camera*

10  discussion between the judge and a juror to ascertain bias did not violate the defendant's right to

11  due process). When the defendant's "presence would be useless, or the benefit but a shadow," due

12  process does not require the defendant's presence at a trial proceeding. *Snyder v. Massachusetts*,

13  291 U.S. 97, 106-07 (1934)). Furthermore, in order to show that a criminal defendant is guaranteed

14  a right to be present in person, and not merely through counsel, petitioner must show that his own

15  personal presence, beyond counsel's representation of him, "would contribute to the fairness of

16  the procedure." *Stincer*, 482 U.S. at 745. Judges' discussions with counsel about peremptory

17  challenges and administrative jury matters are "prototypical examples of instances 'when [a

18  defendant's] presence would be useless, or the benefit but a shadow.'" *United States v. Reyes*, 764

19  F.3d 1184, 1196 (9th Cir. 2014) (quoting *Snyder*, 291 U.S. 97). In determining whether exclusion

20  of a defendant from a proceeding violated due process, we consider the proceedings "in light of

21  the whole record." *Gagnon,* 470 U.S. at 526–27, 105 S.Ct. 1482.

22

23

1    Petitioner has not produced a transcript of the part of the proceedings in which the jury

2  inquiry was discussed and indicates that he does not know whether such a transcript exists.[14]

3  Respondent indicates that their review of the transcripts of the state court proceedings shows that

4  such a transcript does not exist. Dkt. 38, at 41. Petitioner fails to show the state appellate court's

5  rejection of this claim was an unreasonable determination of the facts or contrary to or an

6  unreasonable application of Supreme Court precedent. Petitioner cites no Supreme Court

7  precedent, nor is the Court aware of any, holding that discussion of a jury question requesting

8  review of a transcript is a critical stage of trial at which a criminal defendant has a right to be

9  present. The Court notes that although the Ninth Circuit has indicated that the right to be present

10  includes the right to be present, personally or through counsel, in conferences when jury notes are

11  discussed, *Frantz v. Hazey*, 533 F.3d 724, 743 (9th Cir. 2008) (en banc), *United States v.*

12  *Barragan–Devis,* 133 F.3d 1287, 1289 (9th Cir. 1998), it does not appear the Supreme Court has

13  adopted this holding or directly addressed this issue. Furthermore, petitioner does not argue that

14  his attorney was not present but only that he, himself, was not present during the discussion of the

15  juror question.

16    In the absence of Supreme Court authority holding that discussion of a jury question

17  requesting review of a transcript is a critical stage of trial at which a criminal defendant has a right

18  to be personally present, petitioner is not entitled to federal habeas relief. *See La Crosse v. Kernan,*

19  244 F.3d 702, 707–08 (9th Cir. 2001) (absent Supreme Court authority addressing whether

20  readback of testimony is a critical stage, it cannot be said that a state court's rejection of a claim

21  that the petitioner had a right to be present at that stage "was contrary to or an unreasonable

22

23

---

[14] Respondent indicates that petitioner apparently obtained the information regarding the juror question from his attorney's file which the record shows was turned over to petitioner in its entirety. Dkt. 38, Dkt. 39, Ex. 14, at 3, Ex. 12, at 2.

REPORT AND RECOMMENDATION - 48

application of clearly established federal law"); *Lopez v. Hernandez,* 2010 WL 2764699, *7 (N.D.Cal. July 13, 2010) (in the absence of Supreme Court authority holding that answering jury questions is a critical stage of the criminal proceedings, the petitioner could not prevail on his claim that he was denied his right to be present); *accord Scott v. Harrington*, No. CV 11-5738-GAF AJW, 2014 WL 3571732, at *31 (C.D. Cal. June 10, 2014), *report and recommendation adopted*, No. CV 11-5738 GAF AJW, 2014 WL 3589828 (C.D. Cal. July 18, 2014).

The Court also notes that petitioner offers no specific argument, facts or evidence to indicate that his personal presence would have contributed to the fairness of the proceeding where the jury question was discussed or served any useful purpose. *See Stincer*, 482 U.S. at 745. Likewise, petitioner presents no specific argument or evidence that the jury's question seeking to review a transcript raised a disputed issue of fact under the standard articulated by Washington state courts.

To the extent petitioner's claim can be construed as arguing that counsel was ineffective in failing to object to petitioner's absence, he fails to demonstrate either deficient performance or prejudice. As discussed above, petitioner's claims of conspiracy or intentional ineffectiveness by trial counsel are unsupported by any facts or the record, and here petitioner fails to demonstrate there was a viable basis for counsel to object based on petitioner's absence from the proceeding, or that if counsel had objected that there is a reasonable probability that the outcome of the trial would have been different.

Accordingly, Ground 1(H) should be DENIED.

    g.  *Ground 1(I)*

In Ground 1(I), petitioner claims:

DEFENSE ATTORNEYS DELIBERATELY FAILED TO CHALLENGE THE ADMISSIBILITY OR AUTHENTICITY OF THE TERRY JONES VIDEO BECAUSE THE PROSECUTION NEEDED THE VIDEO TO SUPPORT

PROSECUTOR MILLER'S PROSECUTION THEORY THAT THE VIDEO DEPICTED TWO MEN CARRYING MARGILYN, ONE OF WHOM WAS THE SHOOTER, WITH DEFENSE ATTORNEY INVADING THE JURY PROVINCE BY STIPULATING THAT THE ONE OF THE TWO MEN WEARING A WHITE LONG SLEEVE SHIRT WAS NOT A SUSPECT, THEREBY CONTRADICTING RYAN TREES' TESTIMONY THAT THE ONE OF THE TWO MEN WEARING THE WHITE SHIRT WAS THE SHOOTER.

The defense attorneys, the prosecutor and the trial judge all knew that the Terry Jones video was taken in violation of Washington statutory law, and the Washington Constitution Article I, 7; and all said judicial participants knew if the jury heard the audio of the video, the jury would know the video was a fruit of a poisonous tree and that the raped [sic] succession of shots fired could not support two separate and distinct intents as charged in the information.

The fraudulent "special person" legal personage Terry ones and the lack of valid authenticity simply rendered the Terry Jones video inadmissible, therefore, the judicial participants sent the Terry Jones video back to the jury for deliberations without said video ever being properly admitted into evidence, with an attempt to conceal the impropriety by making both the Joe Rutter 911 tape and the Terry Jones video the same Exhibit number, i.e., Exhibit 166.

Dkt. 5, at 56.

Under Washington state law, the authentication of evidence is governed by Washington Rule of Evidence (ER) 901. The rule provides:

**(a) General Provision**. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

**(b) Illustrations**. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this Rule:

(1) *Testimony of Witness with Knowledge*. Testimony that a matter is what it is claimed to be.

....

(4) *Distinctive Characteristics and the Like*. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

Wa. R. Rev. ER 901. Under Washington state law, to authenticate photographic or video recording evidence, the proponent must put forward a witness "able to give some indication as to when, where, and under what circumstances the photograph was taken, and that the photograph accurately portrays the subject illustrated." *State v. Newman*, 4 Wn. App. 588, 592–593, 484 P.2d 473 (1971). The witness does not necessarily need to be the photographer. *Id.* Nor does the

authenticator necessarily need to have been present at the creation of the video. *State v. Sapp*, 182

Wn. App. 910, 916, 332 P.3d 1058 (2014).

Here, the record reflects the following exchange regarding the video evidence during

pretrial proceedings:

> COURT: I just need to watch [the video]. If everybody says it is what it is, we agree it is what it is, and the foundation is satisfied and it's just the quality that's at issue, then I don't need to look at it at all and it's just it goes to the finder of fact to determine if there's anything there that's helpful.
> MS. TVEDT [Defense Counsel]: I think the narration might be –
> COURT: The narration is a different issue. […]
> My ruling would be audio stays out. All you do is just play the visual images. Now, having said that, do I need to review it?
> MS. Miller [Prosecutor]: No, not from the State's viewpoint.
> COURT: I'm asking the defense.
> MR. FLANNAUGH: Your Honor, I don't have an objection based on –
> COURT: It is what it is.
> MR. FLANNAUGH: Right. I don't have an objection. It's not a viewing of something else besides –
> COURT: I mean, the objection would be there's lack of foundation.
> MR. FLANNAUGH: Right.
> COURT: Or that it's too prejudicial because it's got a lot of stuff in it that's not probative at all. Other than that, it's admissible.
> MR. FLENNAUGH: I don't have an argument with the State that it was of a different shooting or in a different parking lot or whatever.
> COURT: It was – they are moving images of events that happened at the scene at about the time of the event.
> MR. FLENNAUGH: That's what it appears to show. I think they can bring in a police officer who (inaudible) .
> COURT: Then it's admissible without the sound. […]

Dkt. 39, Ex. 17, at 200. The record reflects that, based on trial counsel's representation that he did

not have a good faith argument to object to the authenticity or admissibility of the video, the Court

ruled the video was admissible without the sound.

The record further indicates that the individual who recorded the video, Terry Jones,

testified that he had been taking a video overlooking the location of the incident on the night of

the incident. Dkt. 39, Ex. 24, at 194 – 204. He testified he heard "loud pops and a lot of screaming"

and saw two individuals helping "somebody or something" who appeared to be "limp" across the

parking lot and putting them in a car and that he had captured this on his video camera. *Id*. He

1    testified that when he saw police arrive on the scene, he showed them his video camera and

2    provided them a copy of the video he had taken. *Id.* Ben Hughey, the detective who was shown

3    the video and equipment by Mr. Terry and took a copy of the video also testified to that effect.

4    Dkt. 39, Ex. 22 at 19-23.

5         Here, petitioner fails to explain the basis upon which he believes counsel should have

6    objected to the authenticity or admissibility of the video, nor is one apparent from the record. Nor

7    does petitioner explain his argument that the video was taken in violation of Washington statutory

8    law or the Washington Constitution and was "fruit of the poisonous tree." Based on the record

9    before the court it appears the individual who recorded the video, Terry Jones, and the detective

10   who took the copy of the video, Ben Hughey, also testified at trial which, under the state rules of

11   evidence, would likely have been sufficient to authenticate the video. Petition fails to identify any

12   deficiency that would have rendered the video inadmissible or provided a valid basis for trial

13   counsel to object. Further, even assuming the testimony before the Court would have been

14   inadequate to meet ER 901's authentication requirement, on the record before the Court petitioner

15   fails to show the prosecution would have been unable to authenticate the video (particularly in

16   light of the fact that the witness who recorded the video and the detective who took the copy of

17   the video were present and available to testify) had defense counsel raised an ER 901 objection.

18   As such, petitioner fails to demonstrate there was a viable basis for counsel to object on

19   authentication or admissibility grounds, that counsel was deficient for failing to make an objection,

20   or that if an objection had been made there is a reasonable probability the result of the proceeding

21   would have been different. *See Strickland*, 466 U.S. at 689, 694. Accordingly, Ground 1(I) should

22   be DENIED.

23         *h.   Ground 1(J)*

In Ground 1(J), petitioner argues

> DEFENSE ATTORNEYS FLENNAUGH AND TVEDT MADE AN UNCONSTITUTIONAL AGREEMENT WITH PROSECUTOR MILLER TO NOT OBJECT TO HER UNLAWFUL AND IMPROPER COAXING THE JURY INTO ASKING TO SEE THE TERRY JONES VIDEO AND THE JOE RUTTER 911 TAPE DURING JURY DELIBERATIONS.
>
> It is clear from the record that defense Attorneys Flennaugh and Tvedt made an unconstitutional and unethical agreement with Prosecutor Miller to not object to Prosecutor Miller badgering the jury into requesting to see the Joe Rutter 911 tape and the Terry Jones video being played for the jury without Petitioner Phongmanivan or the other judicial participants being present, however, with other unauthorized persons being present to operate the 911 tape and video; where it appears more than once, without the public allowed to be present, and other improprieties that cannot be completely identified until Petitioner Phogmanivan is provided a copy of the records he has request [sic] from his appointed appellate Attorney Wilk[.]

Dkt. 5, at 58.

Although Ground 1(J) appears to be framed as a challenge to the alleged conspiratorial actions, or intentional ineffectiveness, of petitioner's trial attorneys, the state Supreme Court also separately addressed and rejected the argument that petitioner was denied his right to be present when the jury asked to review a video and a 911 call. Specifically, the Supreme Court stated:

> Mr. Phongmanivan also argues that he was denied his right to be present when the jury asked to review a video and a 911 call. Again, [as with petitioner's claims regarding the juror question] these matters were not critical stages that involved disputed facts. While the underlying facts contained in the recordings may have been disputed, the discussion of how to address the jury's request was not a critical stage of the trial.

Dkt. 39, Ex. 14.

Petitioner fails to show the state appellate court's rejection of his claim was an unreasonable determination of the facts or contrary to or an unreasonable application of Supreme Court precedent. First, as respondent points out, the record reflects that petitioner waived his presence in the event the jury requested permission to review these recordings. Dkt. 39, Ex. 27, at 153-154. During closing argument, the prosecutor informed the jury that they could request the Court's permission to review the 911 call and video. *Id.* Subsequently a discussion was held as to whether the State and defense should be present if the jury asked to listen to the recordings. *Id.*, at

153-154. The record indicates that trial counsel consulted with petitioner and then indicated to the Court that petitioner waived his presence, and thereafter defense counsel and the prosecutor also determined they would not be present. *Id.* Thus, the record shows when the jury asked to see the recordings, they were played to the jury in front of the judge only who then released the jury back to the deliberations room after reviewing the tapes. *Id.*, at 182-184.

Petitioner cites no Supreme Court precedent, nor is the Court aware of any, holding that discussion of a jury question requesting to review evidence in the form of a video or 911 recording or the review of that evidence is a critical stage of trial at which a criminal defendant has a right to be present, particularly when the defendant has explicitly waived his presence after consulting with counsel. In the absence of Supreme Court authority holding that discussion of a jury question requesting review of a video or 911 recording, or review of those recordings, is a critical stage of trial at which a criminal defendant has a right to be present, petitioner is not entitled to federal habeas relief. *See La Crosse,* 244 F.3d at 707–08 (absent Supreme Court authority addressing whether readback of testimony is a critical stage, it cannot be said that a state court's rejection of a claim that the petitioner had a right to be present at that stage "was contrary to or an unreasonable application of clearly established federal law").

The Court also notes that petitioner offers no specific argument, facts or evidence to indicate that, despite his waiver, his presence would have contributed to the fairness of the proceeding in which the jury question was discussed or the jury reviewed the recordings, or that his presence would have served any useful purpose. *See Stincer*, 482 U.S. at 745. Likewise, petitioner presents no specific argument, facts or evidence that the jury's question or their review of the recordings raised a disputed issue of fact under the standard articulated by the Washington state courts.

1    To the extent petitioner's claim can be construed as arguing that counsel was ineffective in

2  failing to object to petitioner's absence, he fails to demonstrate either deficient performance or

3  prejudice. As discussed above, petitioner's claims of conspiracy or intentional ineffectiveness by

4  trial counsel are unsupported by any facts or the record, and here petitioner fails to demonstrate

5  viable basis for counsel to object based on petitioner's absence, that counsel was deficient for

6  failing to make an objection, or that if an objection had been made there is a reasonable probability

7  the result of the proceeding would have been different.

8    Accordingly, Ground 1(J) should be DENIED.

9        *i.    Ground 1(K)*

10    DEFENSE ATTORNEYS FLENNAUGH AND TVEDT ALONG WITH
     PROSECUTOR MILLER AND THE TRIAL JUDGE PARTICIPATED IN AN
11   UNCONSTITUTIONAL SELECTION OF JURORS THAT WERE NOT
     LAWFULLY AND RANDOMLY SELECTED FROM A FAIR CROSS SECTION
12   OF THE COMMUNITY RESULTING IN THE JURY IN THIS CASE BEING
     COMPOSED OF PREVIOUSLY REJECTED JURORS.
13        Petitioner Phongmanivan was deprived of his fundamental constitutional right
     to be tried only of a lawfully and randomly selected jury from a fair cross-section of
14   the community.
          Although Petitioner Phogmanivan has not yet been provided a copy of the jury
15   voir dire and jury hardship dismissal proceedings, see Appendix (K), the existing
     record provides conclusive evidence that the random selection process requirement was
16   breached by rejected jurors form various trials being re-entered into the jury pool
     culminating in not a random selection of jurors from a fair cross section of the
17   community, but a jury that was selected from a pool of previously rejected jurors [..]

18  Dkt. 5, at 60. The only specific evidence petitioner points to in support of this claim is that one

19  juror was excused and replaced by another juror during jury deliberations because he had indicated

20  he had not heard some testimony due to a hearing issue. Dkt. 5, at 60-61.

21    Although Ground 1(K) appears to be framed as a challenge to the alleged conspiratorial

22  actions, or intentional ineffectiveness, of petitioner's trial attorneys, the state Supreme Court also

23  separately addressed and rejected the argument that petitioner's rights were violated by the

    composition of the jury pool. Specifically, the Supreme Court found:

REPORT AND RECOMMENDATION - 55

1

2

3

4

5

6

7

Mr. Phongmanivan also argues that jury selection was improper in that the jury pool consisted in part of venire members who had been reentered into the pool after previous rejection in other trials, and that this resulted in a jury pool that was not representative of a fair cross-section of the jury. An individual does not have the right to a particular juror or jury. *State v. Gentry*, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995). And prejudice in selection of the jury pool will be presumed only if there is a material departure from the statutory requirements. *City of Tukwila v. Garret*, 165 Wn.2 152, 161, 196 P.3d 681 (2008). If there is substantial compliance with the statute, then a challenger may claim error only if he or she establishes actual prejudice. *Id.* In establishing actual prejudice, the reviewing court looks to whether any class of citizen was excluded, whether the jury list was weighted in some manner, or whether it was not a fair cross-section of the community. Here, the record does not demonstrate any material departure from the standard jury selection practices, and Mr. Phongmanivan fails to explain why a juror rejected from one trial somehow upsets the balance regarding a fair cross-section of the community.

8     Dkt. 39, Ex. 14, at 6-7.

9         A criminal defendant has a constitutional right originating from the Sixth Amendment to a

10    fair and impartial jury pool composed of a cross-section of the community. *See Holland v. Illinois*,

11    493 U.S. 474, 480 (1990); *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). In *Duren v. Missouri*,

12    439 U.S. 357, 364 (1979), the Supreme Court held that to show a *prima facie* violation of the fair-

13    cross-section requirement, a criminal defendant must show "(1) that the group alleged to be

14    excluded is a 'distinctive' group in the community; (2) that the representation of this group in

15    venires from which juries are selected is not fair and reasonable in relation to the number of such

16    persons in the community; and (3) that this underrepresentation is due to systematic exclusion of

17    the group in the jury-selection process." *Duren*, 439 U.S. at 36; *see Rodrigues v. Montgomery*, No.

18    C 96-01831 CW, 2016 WL 4611562, at *26 (N.D. Cal. Sept. 6, 2016), *aff'd sub nom. Rodrigues*

19    *v. Davis*, 735 F. App'x 918 (9th Cir. 2018);

20        Petitioner appears to argue that his constitutional rights were violated by including jurors

21    in the jury pool who had not been selected for the juries in other cases. But the only specific facts

22    petitioner points to in support of this argument is the dismissal of a single juror during jury

23    deliberation (and replacement with an alternate juror) who indicated, upon being questioned, that

1    he had not heard all of the testimony and that he had sat in on one other trial but had been excluded

2    from others because of his hearing issue. Dkt. 39, Ex. 27, at 159-80. Petitioner cites no Supreme

3    Court precedent, nor is the Court aware of any, holding that inclusion of a juror, or even jurors, in

4    a jury pool who were not selected for juries in other trials for unspecified reasons violates

5    petitioner's right to a jury pool composed of a cross-section of the community. Nor does petitioner

6    cite any Supreme Court precedent indicating that the inclusion of a juror in a jury pool who had

7    not been selected for the jury in some other cases because of hearing difficulties but had been

8    selected in another, violates petitioner's right to a jury pool composed of a fair cross-section of the

9    community.

10           In the absence of Supreme Court precedent creating clearly established federal law relating

11    to this issue, petitioner fails to demonstrate the state court's rejection of his claim was contrary to

12    or an unreasonable application of clearly established federal law, nor does he demonstrate the state

13    court's determination was an unreasonable determination of the facts. Petitioner also makes no

14    specific argument and points to no facts which would show a prima facie violation of the fair-

15    cross-section requirement under *Duren*, that is, that the group alleged to be excluded is a

16    'distinctive' group in the community; that the representation of this group in venires from which

17    juries are selected is not fair and reasonable in relation to the number of such persons in the

18    community; and that this underrepresentation is due to systematic exclusion of the group in the

19    jury-selection process. *Duren*, 439 U.S. at 364. Finally, petitioner makes no specific argument and

20    points to no facts to indicate that, contrary to the state appellate court's finding, there was "a

21    material departure from the statutory requirements" under the state standard, or that he suffered

22    actual prejudice as a result.

23

To the extent petitioner's claim can be construed as arguing that counsel was ineffective in failing to object to the composition of the jury pool, he fails to demonstrate either deficient performance or prejudice. As discussed above, petitioner fails to demonstrate a viable basis for counsel to object regarding the composition of the jury pool, that counsel was deficient for failing to make an objection, or that if an objection had been made there is a reasonable probability the result of the proceeding would have been different. Accordingly, Ground 1(K) should be DENIED.

j.    *Ground 1(L)*

In Ground 1(L), petitioner alleges:

DEFENSE ATTORNEY FLENNAUGH AND TVEDT ACTED IN CONCERT WITH PROSECUTOR MILLER TO OBTAIN A DIFFERENT JUDGE JUST PRIOR TO TRIAL BECAUSE THEN JUDGE HAYDEN HAD ALREADY INFORMED SAID ATTORNEYS THAT THEY WOULD NOT BE ALLOWED TO CHALLENGE JURORS FOR CAUSE AT A BENCH CONFERENCE AND TO DEPRIVE PETITIONER PHONGMANIVAN OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS OF LAW BY AVOIDING SPECIFIC RULINGS WITH PURPOSE TO PREVENT PETITIONER PHONGMANIVAN FROM ADEQUATE BASIS FOR A MEANINGFUL APPEAL.

Dkt. 5, at 61.

As discussed above, the state Supreme Court reasonably rejected petitioner's claims of conspiracy by trial counsel, the prosecutor and trial judge to render petitioner's trial unfair as unsupported by facts or the record. Here, petitioner's allegations are vague, conclusory and unaccompanied by factual support or explanation. Petitioner offers no evidence or facts to support his claims that trial counsel conspired with the prosecutor to obtain a different judge nor does he identify or explain what "specific rulings" he is referring to. Petitioner fails to allege sufficient facts to establish trial counsel's performance was deficient or that he was prejudiced as a result of that performance. *See James v. Borg*, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief." (internal citation omitted)). Accordingly, Ground 1(L) should be DENIED.

REPORT AND RECOMMENDATION - 58

k.  *Ground 1(M)*

DEFENSE ATTORNEYS FLENNAUGH AND TVEDT ACTED IN CONCERT WITH
PROSECUTOR MILLER AND JUDGE ROGERS ON 1/7/11 IN VIOLATION OF BOTH
CONSTITUTIONAL AND CRIMINAL LAW WHEN THEY PRETEND TO RECEIVE
A VALID NOTE FROM A JUROR WHO WAS NOT THE JURY FOREMAN WHICH
RESULTED IN THE UNLAWFUL AND UNCONSTITUTIONAL REMOVAL OF
JUROR NUMBER 9.

As discussed above, the state Supreme Court reasonably rejected petitioner's claims of
intentional ineffectiveness and conspiracy by trial counsel, the prosecutor and trial judge to render
petitioner's trial unfair as unsupported by facts or the record. Here, petitioner's allegations are vague,
conclusory and unaccompanied by factual support or explanation. Petitioner fails to identify the basis
for his claim that the removal of juror number 9 was "unlawful and unconstitutional" apart from his
general unsupported allegation of conspiracy by trial counsel, the prosecutor, and the judge, to render
his trial unfair. The record shows juror number 9 was removed after a note was submitted from the
jury related to comments that juror 9 had made regarding difficulty hearing certain testimony. Dkt. 39,
Ex. 27, at 159-80. After questioning the juror with counsel for both sides present, the judge determined
it was appropriate to dismiss juror 9 and replace him with the alternate with the direction that the jury
begin their deliberations anew. *Id.* Petitioner also fails to explain how he was in any way prejudiced
by the replacement of the juror with an alternate juror. Petitioner fails to allege sufficient facts to
establish that trial counsel's performance was in any way deficient or that petitioner was prejudiced as
a result of that performance. *Strickland*, 466 U.S. at 687; *see James v. Borg*, 24 F.3d at 26
("Conclusory allegations which are not supported by a statement of specific facts do not warrant
habeas relief." (internal citation omitted)). Accordingly, Ground 1(M) should be DENIED.

2.  Ground 1(E)

In Ground 1(E) petitioner alleges appellate counsel was also ineffective stating:

AS PART OF THE HEREIN CLAIMED COMPLETE BREAKDOWN OF THE
ADVERSARY PROCESS, APPOINTED APPELLATE ATTORNEY SUSAN WILK
INTENTIONALLY DID NOT RAISE ON DIRECT APPEAL A PLETHORA OF

POTENTIALLY REVERSIBLE GROUNDS, CLAIMS AND ISSUES AND REFUSES TO IDENTIFY ANY APPEAL TACTIC OR STRATEGY THAT WOULD JUSTIFY ATTORNEY WILK FROM FAILING TO RAISE SAID ISSUES ON DIRECT APPEAL AS OF RIGHT.

Appointed Appellate Attorney Susan Wilk has refused to provide Petiitoner Phongmanivan substantial portions of the criminal court record that are essential to identifying and framing all the issue that should raised in his personal restraint petition and has refused to respond to Petitioner Phongmanivan's "FIRST REQUEST TO IDENTIFY APPEAL STRATEGY OR TACTIC REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS" which is set forth in substantial part below[.]

Dkt. 5, at 32-46. Petitioner then attaches a letter he purportedly sent to appellate counsel in which he requests that he explain her tactic or strategy in deciding not to raise various issues on appeal. *Id.*

Claims of ineffective assistance of counsel on appeal are reviewed under a deferential standard similar to that established for trial counsel ineffectiveness in *Strickland v. Washington*, 466 U.S. 668 (1984). *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535 (1986). Under this standard, a petitioner challenging his appellate counsel's performance must demonstrate (1) counsel's performance was unreasonable, which in the appellate context requires a showing counsel acted unreasonably in failing to discover and brief a meritorious issue, and (2) there is a reasonable probability, but for counsel's failure to raise the issue, the petitioner would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. at 285–86; *see also Wildman v. Johnson*, 261 F.3d 832, 841–42 (9th Cir. 2001); *Morrison v. Estelle*, 981 F.2d 425, 427 (9th Cir. 1992), *cert. denied*, 508 U.S. 920 (1993); *Miller v. Keeney*, 882 F.2d 1428, 1433–34 (9th Cir. 1989).

These two prongs "partially overlap" in evaluating appellate counsel's performance because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue" that is, she will "frequently remain above an objective standard of competence (prong one) and have cause her client no prejudice (prong two) for the same reason – because she declined to raise a weak issue." *Miller*, 882 F.2d at 1434. In fact, the

process of winnowing out weaker arguments on appeal and focusing on those issues more likely to succeed is the hallmark of effective advocacy. *Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Miller*, 882 F.2d at 1434. "[A] lawyer who throws in every arguable point—'just in case'—is likely to serve her client less effectively than one who concentrates solely on the strong arguments." *Miller*, 882 F.2d at 1434. Thus, appellate counsel has no constitutional obligation to raise every non-frivolous, colorable issue on appeal. *Jones v. Barnes*, 463 U.S. at 751–54. The exercise of professional judgment in framing appellate issues makes it difficult to demonstrate that counsel's omission of a particular argument was deficient performance. *Smith v. Robbins*, 528 U.S. at 288.

"Absent contrary evidence, [it is] assumed that appellate counsel's failure to raise a claim was an exercise of sound appellate strategy." *United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir. 2008) (internal citations and quotation marks omitted). Furthermore, failure to challenge trial counsel as ineffective is not ineffective assistance of appellate counsel where trial counsel's performance did not fall below the *Strickland* standard. *Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991). Appellate counsel is not ineffective in refraining from appealing a correct ruling. *People of the Territory of Guam v. Santos*, 741 F.2d 1167, 1169 (9th Cir. 1984). And if there is no prejudice from a trial error, there can be no prejudice from an appellate error based on the same issue. *Garcia v. Quaterman*, 454 F.3d 441, 450 (5th Cir. 2006). Habeas relief is unavailable on a claim of appellate-counsel ineffectiveness unless the state court's denial of the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair[-]minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

1    The state appellate courts rejected petitioner's claim of ineffective assistance of appellate

2    counsel. The Court of Appeals stated, in relevant part:

3            Phongmanivan admits that he does not possess much of the evidence he believes
             will support his claims.[15] But Phongmanivan's unsubstantiated allegations are insufficient
4            to warrant relief in a personal restraint petition. […]
             Phongmanivan contends that appellate counsel was ineffective for failing to
5            request transcription of voir dire and jury deliberations. However, the absence of a portion
             of the trial record is not reversible error unless the defendant can demonstrate prejudice.
6            *State v. Miller*, 40 Wn. App. 483, 488, 698 P.2d 1123 (1985). Phongmanivan fails to
             demonstrate prejudice.
7            Phongmanivan has not met his burden of showing that trial counsel was
             ineffective. Consequently, he has failed to demonstrate that he would have prevailed on
8            appeal if appellate counsel had raised the issue.

9    Dkt. 39, Ex. 12. The state Supreme Court denied review and did not separately address petitioner's

10   ineffective assistance of appellate counsel claim. Dkt. 39, Ex. 14.

11         To the extent petitioner argues appellate counsel was not as responsive to his letters as he

12   would have liked, he fails to identify a viable ineffective assistance of appellate counsel claim. To

13   the extent petitioner argues appellate counsel was somehow "intentionally" ineffective as part of

14   the "complete breakdown of the adversary process", he points to no facts, beyond his own

15   speculation to support this assertion. To the extent petitioner argues appellate counsel failed to

16   provide him with evidence or portions of the record, the state appellate courts found that appellate

17   counsel had provided petitioner with his entire client file and petitioner presents no specific facts

18   or argument to indicate that this is inaccurate. Dkt. 39, Ex. 12. To the extent petitioner argues

19   appellate counsel was ineffective in failing to request transcription of portions of the record, the

20   only specific portion he identifies (that the Court can decipher) is that of voir dire and petitioner

21   fails to adequately specify or explain what viable claims he or his appellate counsel could have

22

23   ---
     15 [Footnote 1 by Court of Appeals] Phongmanivan contends that trial and appellate counsel have refused
     to provide him with this evidence. In response to Phongmanivan's claim, Washington Appellate Project,
     Phongmanivan's appointed counsel in his direct appeal, informed this court that they have provided
     Phonmanivan his entire client file.

1    raised on appeal had his appellate counsel obtained the transcripts that petitioner claims should

2    have been obtained. *See James v. Borg*, 24 F.3d at 26 ("Conclusory allegations which are not

3    supported by a statement of specific facts do not warrant habeas relief." (internal citation omitted)).

4    As such petitioner also fails to demonstrate that there is a reasonable probability that but for

5    counsel's failure to request the transcriptions, petitioner would have prevailed on his appeal. *See*

6    *Miller*, 882 F.2d at 1434-35.

7        Finally, even if the Court were to construe petitioner's claim to argue that appellate counsel

8    failed to raise claims of ineffective assistance of trial counsel he felt should have been raised on

9    appeal, he fails to identify any claim that would have entitled him to relief. Generally ineffective

10   assistance of trial counsel claims are not reviewable on direct appeal because the reviewing court

11   will not consider matters outside the trial record and, therefore, appellate counsel's failure to raise

12   such claims demonstrates neither deficient performance or prejudice.[16] *State v. McFarland*, 127

13   Wash. 2d 322, 335, 899 P.2d 1251, 1257 (1995), *as amended* (Sept. 13, 1995) ("Where, as here,

14   the [ineffective assistance of counsel] claim is brought on direct appeal, the reviewing court will

15   not consider matters outside the trial record. […] The burden is on a defendant alleging ineffective

16   assistance of counsel to show deficient representation based on the record established in the

17

18   ───────────────

     [16] The Court also notes that the only argument that stands out in petitioner's letter to appellate counsel is
19   that trial counsel erred in stipulating that "Noy Mekavong was not a suspect, leaving the only potential
     shooter being [petitioner][.]" Dkt. 5, at 17. Petitioner points to the Court of Appeals decision stating that
20   there was testimony that "one of the men who carried [Ms.] Umali was the shooter" and that "[t]he defense
     stipulated that [petitioner] and another person carried [Ms.] Umali to the car and that the other person who
     carried her to the car was not a suspect." Dkt. 38, Ex. 5, at 1-5; *State v. Phongmanivan*, Court of Appeals
21   Cause No. 6685-7-I, 175 Wash. App. 1028 (2013). There was also testimony in the record that petitioner's
     friend, Mr. Mekavong, was the other individual carrying Ms. Umali. The Court notes that even assuming
22   this is a claim that would have been reviewable on direct appeal, petitioner fails to demonstrate it was
     viable. While the parties don't point to where in the record this stipulation can be found, based upon the
23   Court of Appeals decision it appears the stipulation was that the other individual carrying Ms. Umali was
     not a *suspect* not that the other individual was not, in fact, the *shooter*. This is reinforced by defense
     counsel's closing argument in which he points to evidence supporting a possible theory that Mr. Mekavong
     may have been the shooter. Dkt. 39, Ex. 27, at 80, 129-130.

1  proceedings below. If a defendant wishes to raise issues on appeal that require evidence or facts

2  not in the existing trial record, the appropriate means of doing so is through a personal restraint

3  petition, which may be filed concurrently with the direct appeal. *See* Washington State Bar Ass'n,

4  *Appellate Practice Desk Book* § 32.2(3)(c), at 32–6 (2d ed. 1993) (citing *State v. Byrd,* 30

5  Wash.App. 794, 800, 638 P.2d 601 (1981))"); *accord State v. Stockton,* 97 Wash.2d 528, 530, 647

6  P.2d 21 (1982) (matters referred to in the brief but not included in the record cannot be considered

7  on appeal).

8       Accordingly, Ground 1(E) should be DENIED.

9  C.   <u>Evidentiary hearing</u>

10      Because petitioner's claims can be resolved by reference to the state court record, an

11  evidentiary hearing is not necessary. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998)

12  ("[A]n evidentiary hearing is not required on issues that can be resolved by reference to the state

13  court record.").

14            IV.   <u>CERTIFICATE OF APPEALABILITY</u>

15      A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

16  dismissal of his federal habeas petition only after obtaining a certificate of appealability from a

17  district or circuit judge.  A certificate of appealability may issue only where a petitioner has made

18  "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). A petitioner

19  satisfies this standard "by demonstrating that jurists of reason could disagree with the district

20  court's resolution of his constitutional claims or that jurists could conclude the issues presented

21  are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322,

22  327 (2003).  Under this standard, the Court concludes that a certificate of appealability should be

23  DENIED.

REPORT AND RECOMMENDATION - 64

V.    <u>CONCLUSION</u>

The Court recommends petitioner's habeas petition be DENIED without an evidentiary hearing and this action be DISMISSED with prejudice. The Court further recommends that a certificate of appealability be DENIED. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on <u>**May 21, 2021**</u>.

Dated this <u>29th</u> day of April, 2021.


Mary Alice Theiler
United States Magistrate Judge